No. 24,358.

MARY F. PRIEST, *Appellee,* v. KANSAS CITY LIFE INSURANCE
COMPANY, *Appellant.*

#### SYLLABUS BY THE COURT.

1. LIFE INSURANCE—*Indefinite Answers to Special Interrogatories—Refusal of Request for More Definite Answers Error.* Although the answer "We don't know," returned by a jury to a special interrogatory, when no more definite reply is requested, is interpreted as a finding against the party having the burden of proof on the matter involved, it is the right of a party, upon timely application, to have the jury sent back to make a direct response to the question. And in the present case, where the payment of an insurance policy was contested on the ground that false representations concerning his health had knowingly been made by the insured, answers of that character to questions about his condition are held to have been so material as to make the refusal of such an application reversible error.

2. SAME—*Application—False Representations Bearing Upon Applicant's Condition of Health—Question of Fact for Jury.* The evidence is held not to establish conclusively, so as to take the matter from the jury, that an applicant for insurance was in ill health, or that he knowingly made false representations bearing on his condition.

3. SAME — *Application — Knowing Misrepresentations as to Health — Expert Testimony Admissible.* In an action upon a life insurance policy, where the defense is that the insured in his application knowingly misrepresented his state of health, expert medical testimony concerning his condition at that time may be introduced by the defendant, although in part based upon his own history of his case.

4. SAME—*Knowledge of Soliciting Agent that Answers in Application Were False—No Estoppel to Company.* Where false answers concerning his health were knowingly made by an applicant for life insurance, the fact that the agent through whom the application was made, but who was not authorized to decide whether the policy should be issued, knew of their falsity does not prevent the company from successfully resisting payment on the ground of such fraud.

5. SAME—*Construction of Clause of Policy.* The effect of a clause that a life insurance policy shall not take effect unless the applicant is in good health at the time of its delivery is to protect the company against a new element of risk through a change in the applicant's condition arising after the company's investigation had been made.

6. SAME—*Rulings of Court.* Rulings concerning the pleadings and burden of proof considered.

Appeal from Cloud district court; JOHN C. HOGIN, judge. Opinion filed July 5, 1924. Reversed.

*Robert Stone, George T. McDermott, Robert L. Webb, Beryl R. Johnson,* all of Topeka, *James C. Jones,* of St. Louis, Mo., and *Frank W. McAllister,* of Kansas City, Mo., for the appellant.

*Park B. Pulsifer, Clyde L. Short, Charles L. Hunt,* and *C. J. Putt,* all of Concordia, for the appellee.

The opinion of the court was delivered by

MASON, J.: On January 26, 1914, a policy for $10,000 upon the life of Wilson R. Priest, a physician and surgeon of Concordia, fifty-three years of age, was issued by the Kansas City Life Insurance Company, whose principal office was in Kansas City, Mo. Doctor Priest died November 9, 1914. His widow recovered a judgment upon the policy and the company appeals.

Payment of the policy was resisted on the ground that death resulted from kidney disease and palpitation of the heart, and that in the application the insured had falsely represented that he was in good health and free from any disease or infirmity, that he had never had palpitation of the heart or kidney or bladder disease, and that he had not within five years consulted a physician, whereas he knew he was not, and for a long time had not been, in good health, but had had palpitation of the heart, dyspnœa, arterial sclerosis, angina pectoris, enlargement of the heart, excessive blood pressure, Bright's disease and albuminuria, and had consulted a number of physicians within the period named.

1. The jury returned the answer "We don't know," or its equivalent, to questions whether on or before the date of the application the insured had any disease of the kidneys, nephritis, chronic Bright's disease, enlargement of the heart or arterial sclerosis, and whether he had consulted a physician within five years before that time. To questions whether he then had Bright's disease or was in bad health they answered, "We don't think so." To questions whether in one instance enlargement of the heart and in another arterial sclerosis contributed to his death they answered, "It may have."

Upon the return of the verdict and special findings the defendant asked that the jury be required to make each of the latter more specific, and now complains of the refusal of its request. The answer "I don't know," when returned by the jury to a special question and allowed to stand, is interpreted as a finding against the party having the burden of proof, inasmuch as it warrants an inference that there was no preponderance of evidence in his favor. But if a timely

Priest v. Life Insurance Co.

request is made to require the jury to return an explicit answer, it should be granted. "It is  .  .  .  a right of a party to have a direct response to the questions." (*Morrow et al. v. Comm'rs of Saline Co.,* 21 Kan. 484, 503; *Telegraph Co. v. Morris,* 67 Kan. 410, 416, 73 Pac. 108; see, also, *Corley v. Railway Co.,* 90 Kan. 70, 77, 133 Pac. 555, and cases there cited; Note, Ann. Cas., 1916B 283.) This rule has been held not to apply to interrogatories concerning the nature of the negligence causing fires to be set out by the operation of a railroad, but that is because of the statutory presumption. (*Hilligross v. Railway Co.,* 84 Kan. 372, 114 Pac. 383.)

For the plaintiff it is argued that any defect in the special findings ought not to cause the judgment to be set aside, because if the answers had been favorable to the defendant they would not have been necessarily inconsistent with the general verdict. The policy provided that "statements made by the insured shall, in the absence of fraud, be deemed representations and not warranties." Therefore the action cannot be defeated on account of false statements in the application unless they were known by the insured to be false. The special interrogatories submitted to the jury related only to the fact of the ill health of the insured, not to his knowledge of the matter inquired about, except in respect to his having consulted a physician. The fact of the insured having various symptoms and diseases was one of the elements entering into the ultimate fact sought to be proved by the defendant—that the insured knowingly made false representations regarding his condition. The defendant was entitled to have its questions in this respect definitely and directly answered, in order that the theory upon which the general verdict was based should be explicitly shown. The very purpose of submitting special interrogatories is in order that the decision of the jury may be had upon the component parts upon which the general verdict must be built up. This purpose is defeated by allowing a direct answer to be evaded.

"The main object of special questions is to bring out the various facts separately, in order to enable the court to apply the law correctly, and to guard against any misapplication of the law by the jury. It is matter of common knowledge that a jury, influenced by a general feeling that one side ought to recover, will bring in a verdict accordingly, when at the same time it will find a certain fact to have been proved which in law is an insuperable barrier to a recovery in accord with the general verdict. And this does not imply intentional dishonesty in the jury, or a failure on the part of the court to instruct correctly, but rather a disposition to jump at results upon a general

theory of right and wrong, instead of patiently grasping, arranging and considering details. Scarcely any jury will, when questioned as to a single separate fact, respond that it exists, without some sufficient evidence of its existence. Its response will, as a rule, be correct, if direct; and if not correct, then evasive and equivocal. And such evasive and equivocal answers always cast suspicion on the verdict. The suggestion springs almost involuntarily that the answers are thus evasive and equivocal from an unwillingness on the part of the jury to stultify themselves so far as to say that the facts were or were not proved, mingled with a fear that a direct and positive answer will avoid the effect of the general verdict they have returned. We do not mean to affirm that this is always the case, or that, in fact, such were the motives that influenced the action of this jury; for sometimes, doubtless, the jury are really uncertain as to the fact, and at the same time their verdict should be in favor of the one party, whether the fact did or did not exist. It is therefore a right ·of a party to have a direct response to the questions." (*Morrow et al. v. Comm'rs of Saline Co.*, 21 Kan. 484, 503.)

Moreover, it cannot be said that the findings as to the actual condition of the insured and as to his having consulted a physician were immaterial, because if they had been directly against the plaintiff they would, if held to be supported by the evidence, make it unnecessary to consider the correctness of several rulings concerning the instructions. For instance, if the findings established the good health of the insured, all questions concerning waiver of false representations, or estoppel to rely upon them, would be eliminated.

2. The defendant urges that the judgment, and the special findings so far as they support it, should be set aside because the uncontradicted evidence of numerous witnesses whose credibility cannot be doubted conclusively proved that the insured had kidney and heart diseases and knew that he had them, and had consulted with physicians within the time referred to.

A number of witnesses testified to facts indicating not only that the insured was afflicted with kidney and heart trouble, but that he knew it and had consulted physicians about it. The defendant asks for a reversal upon the authority of *Glasgow v. Woodmen of the World*, 107 Kan. 354, 191 Pac. 470, where it was held that the credible, corroborated and uncontradicted testimony of a physician that he had been consulted by the insured and had treated him for kidney disease could not be disregarded by the jury merely because his widow testified that she had no knowledge of such consultation and treatment.

The defendant's showing in this regard is very strong, but in some material aspects is met by evidence sufficient to present an issue for the jury. For example, a Chicago doctor gave by deposition what

was perhaps the strongest testimony for the defendant. He said that at his office on June 9, 1913, he had examined the insured and found him to have chronic Bright's disease, accompanied by symptoms which he stated in detail. The plaintiff contended that this examination was had in June, 1914, instead of in June, 1913, and in support of the contention introduced evidence fairly tending to show that the insured was in Concordia in attendance on a patient at a hospital from June 5 to June 11, 1913, and was not in Chicago in 1913, but was there in the summer of 1914. Again, a doctor testified to the insured having stopped at Greenleaf while on his way East, leaving the train by reason of sickness, and being treated by him for valvular disease of the heart. The language of the witness in reference to the date of the episode was: "In 1910, 1911, or 1912, I don't remember the exact date, . . . not later than 1912 and not earlier than 1910." He said it was the only time he had ever treated the insured. The plaintiff testified that an incident of this kind had occurred in 1905, and she knew of no other. Her testimony is not to be characterized as merely negative. The likelihood of two such incidents occurring without her knowing of both is sufficiently remote to justify the jury in concluding there was but one. In other parts of the testimony there is some contradiction, and perhaps a basis for inferring a bias on the part of witnesses.

There is considerable evidence of the insured having talked about his condition with other doctors and of his complaining of the state of his health. Except in the case of the Chicago physician, it is possible that these rather informal conversations were not of such character and were not had in such circumstances as to be regarded by the insured or the jury as amounting to consultations with a doctor in the sense intended in the application. Some latitude must be allowed as to the sense in which expressions of that sort are to be understood. (*Kovac v. Sons and Daughters of Justice,* 112 Kan. 178, 210 Pac. 338; *Galloway v. Insurance Co.,* 112 Kan. 720, 212 Pac. 887.)

The statements attributed to him concerning his condition are perhaps open to interpretation as expressions of temporary pessimism. Some of the evidence purported to show such a bad state of health that it may be deemed inconsistent with other evidence concerning the activity of the insured and with the fact of his having been accepted as a risk. Some of the medical opinions were avowedly based upon symptoms shown by the evidence to be open to

more favorable views. A physician who was intimately acquainted with the insured and had administered anæsthetics for him in 1911, 1912 and 1913, seeing him in the two latter years on an average of twice a day, testified that he did not prior to May, 1914, observe in him any indication of Bright's disease, which he at that time regarded as acute, saying, however, that it might become chronic in some circumstances in one or two months. He also said that it was a characteristic of the insured to talk a great deal about his ailments, real or imaginary; and to exaggerate the importance of any trouble he had or thought he might have.

There was evidence that the doctor who examined him thoroughly three weeks before his death said then there was nothing the matter with him except an extreme case of hysterics—that he had been working too hard and would be all right with a little rest and change of climate. A nurse who attended him in his last illness said he imagined he had every kind of ailment known; that he seemed to think his illness dated from February or March, 1914, when he said he caught a cold or grippe; that he often said, "I have been so well all my life; why should I be sick now?" The physician who examined the insured for this policy testified that upon a thorough examination he found nothing abnormal for a man of his age. The defendant's agent through whom the application was made testified (in a deposition taken by the defendant, but introduced by the plaintiff) that he still believed the insured could have procured an equal amount of insurance in another company. The plaintiff testified that she never knew of her husband being a sick man until February, 1914, when he was confined to his bed for two or three days, and that she did not know of his having consulted a doctor in regard to his health before that.

We think there was sufficient contradiction in the evidence and enough room for different opinions concerning the conclusions to be drawn from it to warrant findings that he was not in bad health, did not have chronic Bright's disease or the other ailments negatived by the findings, and did not knowingly make any false statement in his application.

3. A number of physicians called as witnesses by the plaintiff were asked to give their opinions as to the physical condition of the insured prior to his applying for this policy. Wherever such an opinion was founded in part upon the history of the case furnished by the insured, an objection to its admission, interposed upon that

ground, was sustained.  Complaint is made of this ruling.  Ordinarily expert testimōny concerning the condition of a person is not admissible where it is partly based upon his statement of past events.  *(Smith v. Railroad Co.,* 95 Kan. 451, 148 Pac. 759, and cases there cited; 22 C. J. 670; see, also, however, 1 Wigmore on Evidence, § 688.)  But that rule has usually been applied where the subject of inquiry was the extent of injuries suffered by one seeking damages from a defendant responsible therefor, and where a different practice would in effect enable the plaintiff to avail himself of his own self-serving declarations.  It is based upon the principle that since the physician cannot testify to what the plaintiff told him, he should not be allowed to bring about practically the same effect by giving a conclusion of his own founded upon statements he would not be permitted to repeat.  The equal standing of the two classes of evidence is recognized and their relation to each other suggested in this language of an early case in which the matter was considered:

"It would have been perfectly competent for the physician to have testified not merely to the appearance of the wound as he saw it, but also to all statements made by Mrs. Frazier as to her present bodily condition, and to have given to the jury his opinion based upon such examination and statements. [A different rule is applied where the examination is made for the purpose of qualifying the physician as a witness (22 C. J. 671).]  But it would not have been competent for the physician to testify to the jury as to her statements in respect to the cause of the injury, her past experience in connection with the wound, or any statements of her husband in her presence of like character. In other words, he could not give to the jury as evidence her history of the case as detailed to him outside the court room; neither was his opinion as based upon such history of the case proper matter of evidence."  *(A. T. & S. F. Rld. Co. v. Frazier,* 27 Kan. 463, 466.)

The weight of authority appears to be that declarations made by the insured concerning his health are not admissible against the beneficiary to show the falsity of representations made in the application.  (25 Cyc. 936; 14 R. C. L. 1438.)  But a distinction is made, which we regard as sound, in favor of their admissibility upon the issue of the insured having knowledge of such falsity.  (See texts just cited, and notes.)  In the present case testimony of what Doctor Priest had said about his health was freely admitted on both sides. Inasmuch as the physicians who testified concerning his condition might have repeated what he had said to them on the subject, we see no objection to their giving their opinions, even where they were to some extent influenced by his history of the case.

4.  There was evidence tending to show that the agent through

whom the application was made knew that Doctor Priest was seriously ill, but desired to have a policy issued to him because of his prominence, for the influence it would have upon other prospects. The agent testified that he was "state agent" for the company, his office being at Topeka; another witness said he was the general agent for Kansas. A written contract between himself and the company, however, showed that his authority was confined to receiving applications and submitting them for approval. The jury were instructed that although false statements were intentionally made by the insured in his application, the company would be estopped to deny them and would be deemed to have waived the fraud, if this agent knew of their falseness; and also that any knowledge which the medical examiner acquired or should have acquired by his examination or by acquaintance with the insured was imputable to the company. These instructions are complained of. There is some difference of opinion whether an insurance company is chargeable with knowledge of an applicant's condition obtained by its medical examiners or soliciting agent. (14 R. C. L. 1161; 25 Cyc. 862.) But assuming the imputed-knowledge rule to apply to them as well as to other agents, it does not extend to cases where answers are given by the applicant which he and the agent both know to be false, at least where the agent in question has no authority to determine finally whether a policy shall be issued on the application, for the company may not in this manner be made the victim of collusion between its representative and the applicant. (14 R. C. L. 1169; *Mutual Life Ins. Co. v. Hilton-Green,* 241 U. S. 613; *The Homesteaders v. Stapp,* [Tex. Civ. App.] 205 S. W. 743.)

5. The policy contained the familiar provision that it should not take effect "unless the applicant is in good health at the time of its delivery." We do not interpret this to mean that no contract of insurance results if the insured at the time he made his application suffered from an ailment of which he was not conscious and which still existed when he received the policy. Where, without misrepresentation on the part of the applicant, an insurance company after due investigation accepts the risk, and a post-mortem examination reveals that the seeds of a fatal disease existed before the acceptance, the clause referred to will not avail to defeat the collection of the policy. Although a different view is sometimes taken, we consider its purpose and effect to be to protect the company against a new element of risk through a change in the condi-

tion of the applicant occurring after the company's investigation had been made. Upon this question it has been said:

"This clause does not have reference to any unsoundness of health at the time of or previous to the application and medical examination. Although insured had not been in sound health at that time, and there had been no material change since then and the delivery of the policy, the clause would not render it void." (*Metropolitan Life Ins. Co. v. Moore*, 117 Ky. 651, 654.)

"The record herein shows that a period of time elapsed between the date of the applications and the medical examination above referred to, and the delivery of the policies. It is fair to presume that this situation arises in almost every instance where the defendant issues a policy. In that interim the insured may have become seriously ill or suffered a severe injury greatly impairing his health. It is therefore fair to presume that the provision that said policy 'shall not take effect until the first premium has actually been paid to and accepted by the company and the policy delivered to and accepted by the insured while in good health,' was intended to safeguard the defendant against any contingencies that might arise during such interim." (*Fairfield v. Union Life Ins. Co.*, 196 Ill. App. 7, 15. See, also, *N. Y. Life Ins. Co. v. Smith*, 129 Miss. 544; *West. & Sou. Life Ins. Co. v. Davis*, 141 Ky. 358, 361; *Chinery v. Metropolitan Life Ins. Co.*, 182 N. Y. Supp. 555; *Mutual Life Ins. Co. of New York v. Hoffman*, [Ind.] 133 N. E. 405; Note, 29 A. L. R. 656.)

There are decisions to the effect that where a policy has been delivered a clause like that under consideration has spent its force—that its object is to enable the company to withhold delivery if the applicant shall be found to be in ill health. (*National Life Ins. Co. v. Grady*, [N. C.] 117 S. E. 289, and cases there cited.) The soundness of that view need not be now passed upon.

6. The application consisted of three parts, numbered 1, 2 and 3, each written upon a form containing printed questions with blanks for the answers. Part 1, to which the applicant's signature was attached, included information as to the kind of insurance desired, the amounts carried elsewhere, and also the statement that the applicant was in good health and free from every disease and infirmity. Part 2 consisted of declarations made to the medical examiner, signed by the applicant, representing himself to be in good health, not to have certain diseases, and not to have consulted a physician within five years. Part 3 consisted of the examiner's own statement as to conditions observed by him. Parts 1 and 2 were attached to the policy. Part 3 was not. The copy of the policy attached to the petition omitted part 2. The answer set it out. The plaintiff in her reply, which was verified, denied its execution by the insured, alleging that by the request of the company's state agent the applicant had sent to him two of the forms, one signed in blank

—that is, with the blanks unfilled—the other unsigned, but with the blanks filled, and that the answers appearing over the signature were inserted by direction of the agent. The agent deposed that this procedure was followed with respect to one of the parts of the application, saying that the answers originally written on the unsigned blank were correctly transferred to the signed form. His testimony, however, does not show whether he was referring to part 2 or to part 1. His explanation of the method followed was that as manager of the company he did not want to take an application unless he was pretty sure to get it through and protect himself, and therefore wanted the applicant to send in a "trial medical examination." The court instructed the jury that the defendant had the burden of proving that the answers appearing on the part of the application to which this evidence referred were the same as those furnished by the applicant. The defendant complains of that instruction and also of the refusal of the court to strike from the reply the allegations relating to this matter. The document which was signed in blank by the applicant seems to have been part 1 of the application and not part 2, and this circumstance makes the whole matter of less importance. Inasmuch as it is admitted that the answers were transferred from one paper to the other by the company's agent, no serious objection is apparent to placing upon the defendant the burden of proving the transfer to have been accurately made. Nor does reference to the matter in the plaintiff's pleading seem objectionable. The omission of part 2 of the application from the copy of the policy attached to the petition is not now material. Probably the controversy on the subject is due to a misunderstanding of the facts.

The judgment is reversed and a new trial ordered.