No. 25,904.

ENCIL CHAMBERS, *Appellee*, v. NORTH AMERICAN ACCIDENT INSURANCE COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

1. INSURANCE—*Reformation of Policy—Pleading and Proof—Evidence.* In an action to reform a policy of accident insurance to conform to the contract between the insured and the defendant's agent, and to recover on the policy as reformed, the evidence to support plaintiff's cause of action was not subject to an objection on account of variance between pleading and proof, and was sufficient as against a demurrer thereto.

2. SAME—*Power of Agent—Evidence—Reformation of Policy.* Evidence to show a contract for insurance effective on June 12, 1922, between insured and plaintiff's agent examined and held to show by proof, and by admission of defendant, that the agent had authority to fix the date on which the insurance should become effective; and held also that the date, August 15, 1922, which the agent did insert in the policy, was properly corrected to conform to the contract of the parties.

3. SAME—*Power of Agent—Waiver of Objections to Contract.* Record examined and held to show that defendant had so far acquiesced in the acts of the agent acting in its behalf that it was bound by the contract for accident insurance made between that agent and plaintiff.

4. SAME—*Minor Incidents Considered.* Minor incidents noted in the opinion considered and held insufficient to disturb the judgment.

Appeal from Cowley district court; OLIVER P. FULLER, judge. Opinion filed May 9, 1925. Affirmed.

*S. C. Bloss, George T. McNeisch, Martin E. Jarvis, Stewart Bloss*, all of Winfield, and *Edward St. Clair*, of Chicago, Ill., for the appellant.

*W. L. Cunningham*, and *D. Arthur Walker*, both of Arkansas City, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was an action to reform a policy of accident insurance and to recover thereon as reformed.

Plaintiff's evidence tended to prove that on or about June 12, 1922, defendant's agent, J. C. Salisbury, called on plaintiff and his partner, W. H. (Pete) Hill, at Arkansas City. Plaintiff and Hill were young men just out of the army and were aviators and parachute jumpers. They made their temporary headquarters at the garage of Art Hill, a brother of W. H. Hill. Plaintiff's agent, Salisbury, solicited their applications for insurance. Hill said: "You

don't want to see us, you want to see my brother, you can't insure us as we are aviators." Salisbury answered: "Oh yes, I can, too. I just came from Wichita and insured the whole bunch [of aviators] up there." Salisbury drew out a little book and read the names of aviators in Wichita whom he professed to have insured. Those were known to plaintiff and Hill, and so they gave Salisbury their confidence. He offered them a policy which would pay specific sums for specific accidents, so much for a broken bone, so much for the loss of a finger, an arm, an eye, or a leg, so much for sickness, and other details. Plaintiff and Hill admitted that the proposed insurance was attractive but that they were short of money, that they were starting for Nebraska and needed all their funds. A friend, Monroe George, who was one of a number of bystanders who heard the conversation between Salisbury and plaintiff and his partner, said they were foolish, that it was too good a policy for the young men to pass up, and he himself advanced the money for them, $20, which was a $10 payment on a policy for plaintiff and $10 on a similar policy for his partner. The total premium was $20 per annum on each policy, and the balance due was to be paid when the policies were delivered. At the time of the negotiations plaintiff told Salisbury that he was a parachute jumper. Salisbury said:

"You ought to be protected more in that, more so than in flying . . . . It don't matter how you get hurt, get hurt any way in the hotel, car, railroad, any place, . . . got policy anyway."

A witness testified:

"He [Salisbury] said it didn't matter how you get hurt, you see—anywhere, didn't matter where it was, in the air, or any place, said you were insured—said it covered you."

The agent also said the policy would go into effect immediately, and would cover the plaintiff's projected trip to Nebraska. He also said it would probably be thirty days before the policies would be received, but told them not to worry as it would take the policy a long time to go through the head office and back.

The young men left for Nebraska the same day, and gave aerial exhibitions at various places in that state. At Hickman, Neb., on August 12, while giving an aerial performance, plaintiff touched off what he supposed was a harmless smoke bomb, but which was in fact an instantaneous trench mortar bomb which had been delivered by mistake of the manufacturer. It blew the plaintiff out of the aëroplane but by chance he fell back on top of it. The aëroplane

was set on fire and partly wrecked but the pilot managed to bring it to the ground. Plaintiff was badly injured, and confined to a hospital for some time, and under the doctor's care for several months.

The policy which the defendant did issue to plaintiff and which was forwarded to his address at Arkansas City during his absence in Nebraska and which he consequently did not see until after he was injured, contained a copy of his application for insurance and gave his occupation as "aviator"; but the policy contained certain provisions, amongst which were these:

"This insurance does not cover . . . (2) while in or on a baloon or other aërial machine or conveyance; . . . any loss contributed to or caused by . . . exposure to unnecessary danger; . . . while engaged in . . . handling explosives or fire arms."

In the correspondence which passed between the parties, the general agent of defendant wrote to plaintiff:

"Sept. 6, 1922.

". . . Our underwriting department was rather displeased that Mr. Salisbury should write you this particular form as the policy does not cover aviation in any sense of the word, and requested that I write you submitting our [another form of policy] which will give you full protection for all duties of your occupation. While the contract you hold pays indemnity for the accidents and illnesses mentioned, I believe you would be more satisfied with a blanket contract. Therefore, if the enclosed propositions meet with your approval, kindly complete and return the application and we will credit your payment to Mr. Salisbury on the new policy. Kindly return your old policy with the application.          [Signed]     "H. Wayne Russell,

"General Agent."

Plaintiff's claim for insurance was denied, and this action was begun. Plaintiff's petition contained the characteristic allegations of an action to reform the policy to conform to the contract agreed upon with Salisbury and for which the defendant received the agreed premium.

Defendant first demurred, and then answered with a general denial, and denied the authority of Salisbury to make such a contract for the company as that alleged by plaintiff, and alleged that while Salisbury had authority to receive applications for accident and health insurance upon the regular printed blanks furnished by the company, he had no authority to change such printed applications, nor to vary the policy forms issued by defendant; that the authority of Salisbury extended no further than to receive the written application of plaintiff for insurance upon the printed blanks supplied by the company and to forward such written application to the defend-

ant company, and after the issuing of the policy to countersign same and to deliver it to the plaintiff. Defendant further stated that Salisbury had no authority for and on behalf of the defendant to make the alleged representations set forth in the petition, as to the scope and the coverage under such policy, nor did he have authority to make the alleged representations or promises as to the time when said insurance would become effective.

"Defendant further states that it does not issue policies insuring against injury, disability or death to persons engaged in the occupation and business of aviation, or to persons riding in or operating aëroplanes, balloons, or aërial devices."

The jury returned a verdict for plaintiff and answered two sets of special questions, which in part read:

### FIRST SERIES.

"1. State fully how the defendant was injured. A. Explosion. . . .

"3. If you find it was by the explosion of a bomb, where was the bomb at the time of the explosion? A. In his hand. . . .

"5. Might the explosion have occurred if held in the same manner and way by the plaintiff in some other vehicle? A. Yes. (Agreed to by plaintiff.)

"6. Was there an agreement between the plaintiff and Salisbury as to the terms of the policy? A. Yes.

"7. If you answer question 6 'yes,' then state fully what was the agreement. A. Agreed to insure against all accidents. . . ."

### SECOND SERIES.

"Q. 1. Was J. C. Salisbury, on the 12th day of June, 1922, the agent of the defendant insurance company, authorized to solicit accident insurance, take applications, collect and remit premiums, and to receive and deliver policies of accident insurance to those whom he solicited to take insurance in the defendant company? A. Yes.

"Q. 2. Did the defendant, J. C. Salisbury, on or about the 12th day of June, 1922, represent to the plaintiff that the policy of insurance then applied for by the plaintiff, would insure the plaintiff against accidental injuries, and would pay the plaintiff on account of said injuries so sustained the sum of $250 for the loss of each finger, or part thereof, the sum of $250 for each broken bone, the sum of $25 per week for hospital expenses, the sum of $25 per week for medical and surgical bills and the sum of $25 per week for lost time? A. Yes.

"Q. 3. Did the said Salisbury represent to the plaintiff that said policy of insurance would take effect at once upon the signing of the application? A. Yes.

"Q. 4. Did the said Salisbury represent to the plaintiff that said policy would insure him against accidents sustained by him while in his business as an aviator, parachute jumper, or no matter how or where sustained? A. Yes."

The first error assigned pertains to the overruling of defendant's demurrer to the evidence. There was no real dispute in the trial court that Salisbury had represented to the plaintiff that the sort of insurance he was selling him would protect plaintiff against accidental injuries suffered in his work, employment and business as an aviator, and in any work, employment or business in connection with aviation. But defendant argues that plaintiff was not injured in his business as an aviator or in any work incidental to aviation; that he was injured by the explosion of an aërial bomb, which was wholly separable from an accident in the course of aviation; and that plaintiff's petition had not alleged that Salisbury represented that the policy would insure him against accidents due to explosions. What the petition did allege was that Salisbury represented that the insurance he was offering plaintiff would protect him "in the course of his work, employment and business in connection with aviation, as follows: . . . while engaged in exhibition work in an aëroplane, and in dropping aërial bombs for exhibition purposes from said aëroplane one of said bombs prematurely exploded," etc.

The testimony was abundant and all to one effect—that the dropping of aërial bombs was part of the work of an aviator. The evidence disclosed that plaintiff and his partner were incredulous when Salisbury first offered to insure them. They told him they were aviators and parachute jumpers and that it would do them no good to take out insurance unless it covered the risks of their peculiar business. And, without repeating in detail Salisbury's representations, it was clearly shown that the insurance he proposed to sell them would cover them wherever they were, in the air, on the ground, any place. Salisbury said: "We insure everything. It covers all kinds of accidents." The evidence to support plaintiff's cause of action was not defective on account of variance and was sufficient as against a demurrer. (*Roberts v. Surety Co.,* 101 Kan. 375, 376, 166 Pac. 498.)

The next error urged relates to the reformation of the policy contract, particularly as to the date when it should become effective. Salisbury procured plaintiff's application and received the first half of a year's premium on June 12. Salisbury represented that the insurance became effective instanter. By the rules of the company Salisbury concededly had the power to determine and insert in the policy the date when it was to become effective. The answer virtually conceded that much, and the concluding recital of the policy and subscriptions thereto read:

Chambers v. North American Accident Ins. Co.

"In Witness Whereof, the said company has caused this policy to be signed by its President and Secretary, but the same shall not be effective until properly dated and countersigned by duly commissioned authority of the company.

"Dated this 15th day of August, 1922.

"Examined and countersigned by

"Countersigned at Wichita Kansas

"This day 15th of August, 1922

"J. C. Salisbury

<div style="margin-left:2em">

"A. E. Forrest,         .         E. C. Waller,

     "Secretary                     President."

</div>

It is absurd to suppose that plaintiff was paying cash down on June 12, for insurance which was not to become effective for two months and three days thereafter; and it is futile to argue that Salisbury had no authority to agree as to the time when the insurance would become effective when the very policy which the defendant did issue carried on its face the proof of Salisbury's authority to do so. In disregard of his agreement Salisbury fraudulently fixed a date three days after the plaintiff was injured and after the defendant's liability had accrued. Under the evidence the policy contract was not improperly reformed. (*Insurance Co. v. Stone*, 61 Kan. 48, 58 Pac. 986; *Pfiester v. Insurance Co.*, 85 Kan. 97, 116 Pac. 245; *Palin v. Insurance Co.*, 92 Kan. 401, 140 Pac. 886; *Hammond v. Insurance Co.*, 100 Kan. 582, 165 Pac. 291; *Nichols v. Casualty Co.*, 113 Kan. 484, 214 Pac. 1111.)

The next contention is that Salisbury had no authority to issue the policy. Perhaps so. The policy was issued by the joint or coördinating action of various officials acting for defendant. On Salisbury's initiative the company executed it; Salisbury countersigned and dated it and mailed it. Salisbury solicited the business. He represented what sort of insurance he was selling. He made the agreement with plaintiff to insure him against all sorts of accidents, in the air, or any place, and accepted the first payment therefor. The company acquiesced, in part at least, in what Salisbury had agreed to. It kept the money. (*Insurance Co. v. Stone*, supra.) It did issue a policy to plaintiff on Salisbury's initiative. It wrote to plaintiff that one of its departments was rather displeased that "Salisbury should write you this particular form as the policy does not cover aviation." The company declared that the only sorts of insurance which Salisbury had authority to sell were such policies as were issued by the company, and it is clear from defendant's letter of September 6, set out above, that defendant was in the business of insuring aviators; and the just inference from all these

facts, as well as from minor incidents of some evidential value needless to narrate, was that Salisbury was not without authority to contract with plaintiff as he did, and that there was acquiescence in that exercise of authority to such an extent that defendant actually instituted negotiations with plaintiff to induce him to accept a different form of policy from the one Salisbury had agreed to furnish and different, also, from the one Salisbury delivered to him.

Among the cases cited by appellant is *Priest v. Life Insurance Co.*, 116 Kan. 421, 427, 227 Pac. 538. The court discerns no analogy between that case and the one before us. Here it is not even pretended that plaintiff made any false statements in the application signed by him at Salisbury's solicitation. The application contained nothing of consequence beyond the recital that he desired accident and health insurance, gave his name, age, occupation "aviator," and the name of his beneficiary, and some other inconsequential data. Moreover in the Priest case a very serious question of alleged collusion between the insured and the agent to defraud the insurance company was involved. The other authorities cited by appellant have been carefully noted, but they cannot minimize the potency of our own decisions already cited herein.

Among the minor incidents in the record is one concerning Salisbury. On April 29, 1922, defendant wrote to the superintendent of insurance:

"April 29, 1922.

"Supt. of Insurance,
"Topeka, Kans.
"  . . .
"Kindly cancel license No. 30932 issued to J. C. Salisbury of Topeka, Kan., dated April 19, 1922, and oblige."

On June 13, 1922, defendant wrote a second letter:

"Supt. of Insurance,
"Topeka, Kans.
"Your records will disclose that on the 29th day of April 1922, we requested cancellation of license of J. C. Salisbury, Topeka, Kan. Since that time Mr. Salisbury has satisfactorily adjusted his matter with us and this may be treated as our request for an elimination of the record that was made against him at our request."

On September 6, 1922, defendant wrote a third letter:

"Superintendent of Insurance,

"Topeka, Kansas.

"   . . .

"On account of numerous complaints of misrepresentations you will kindly cancel license No. 35946 issued under date of June 29th, 1922, to J. C. Salisbury, and oblige.          [Signed]          "H. Wayne Russell,
                                                "General agent."

Defendant argues that these letters show that on June 12, 1922, Salisbury was not the agent of defendant in any respect. The significance of the letters hardly goes to that extent. Presumably the superintendent acted promptly and complaisantly on receipt of each of these letters, and it may be presumed that on June 12 Salisbury might have had no license from the state of Kansas to act as agent for defendant. But the letters do not prove that he was not its agent on that day; and whether he was or not, it treated him as such, accepted the business he procured for defendant, and acquiesced in his exercise of an agent's authority in his dealings with plaintiff. Nor is the last letter to the superintendent of insurance without its evidential significance in this lawsuit. It was written on the same date and by the same officer of defendant who wrote to plaintiff speaking of the company's displeasure that Salisbury should have contracted with plaintiff for the sort of policy issued to him. The letter tends to show that Salisbury did not lack authority to make contracts for the company, but that he did have such authority and was wont to make a bad use of it; that he was prone to get the company into difficulties and to make misrepresentations for which the company was put to so much annoyance that it had to get rid of him altogether.

There is no error in this record of sufficient consequence to disturb the judgment.

Affirmed.

BURCH, J., concurs in the result.