No. 24,196.

BERTHA C. GALLOWAY, *Appellee*, v. THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA, *Appellant.*

SYLLABUS BY THE COURT.

1. LIFE INSURANCE—*Finding—Retroflexed Uterus Not a Disease—Conflicting Evidence.* A finding by the jury that a retroflexed uterus, from which symptoms had developed, did not amount to a disease is warranted where there is medical testimony tending to support each side of the question.

2. SAME. Where an applicant for life insurance, who knew she had a retroflexed uterus, accompanied by painful symtoms, stated that she had no uterine or ovarian disease, proof that according to correct medical usage these conditions amount to a disease does not necessarily establish fraudulent misrepresentation on her part.

3. SAME—*Questions in Application—Answers Not Conclusive Proof of Fraudulent Misrepresentation.* Where an applicant for life insurance to the question, "On what dates and for what complaints have you been attended by a physician during the past three years?" answered "Doctor Watkins, Farmington, Mo. Influenza, Jan., 1920," conclusive proof of fraudulent misrepresentation or concealment on her part does not result from the fact that at about the same time she had also been treated by another doctor (an osteopath) for the same trouble, which was primarily influenza, accompanied by a retroflexed uterus.

4. SAME. Where an applicant for life insurance returned an affirmative answer to the question, "Are you now in good health?" fraudulent misrepresentation on her part is not necessarily established by the fact that she had within a few months received treatment for a retroflexed uterus and had been advised that an operative procedure might be required for its correction.

5. SAME—*Rulings of Court Nonprejudicial.* Various rulings in a case where the issue was whether fraudulent misrepresentations had been made by an applicant for life insuranace are held to have been correct or at all events nonprejudicial.

Appeal from Reno district court; WILLIAM G. FAIRCHILD, judge. Opinion filed February 10, 1923. Affirmed.

*R. R. Vermillion, Earl W. Evans, Joseph G. Carey, W. F. Lilleston,* and *W. E. Stanley,* all of Wichita, for the appellant; *James H. Guest,* of New York, N. Y., of council.

*Eustace Smith,* of Hutchinson, for the appellee.

The opinion of the court was delivered by

MASON, J.: Olivia E. Peugh died holding two life insurance policies in the Prudential Insurance Company of America, for the benefit of her sister, Bertha C. Galloway, who brought this action for their collection. The company defended on the ground that material

Galloway v. Insurance Co.

misrepresentations had been fraudulently made by the insured in her application. A verdict was returned in favor of the plaintiff, on which judgment was rendered, and the defendant appeals.

1. The policies contained the clause that "all statements made by the insured shall in the absence of fraud be deemed representations and not warranties" and the defendant concedes that in order for misrepresentations to defeat the plaintiff's claim they must have been fraudulently made. To the question in the printed application blank—"Have you ever had uterine or ovarian disease?" the answer of the insured was "No." This is the representation chiefly relied upon by the defendant as having been wilfully false. Its principal contention is that the evidence conclusively showed that the insured at the time had a uterine disease, knew of the fact, and by stating the contrary made an intentionally false representation.

The application was made June 14, 1920. In January of that year a doctor examined her primarily for influenza and gave her treatment at various times extending from January 6 to May 25. She complained of a pain in the right side and low down in the back in the lumbar region. The doctor described her condition thus: "I found the uterus to be misplaced, backward. It was fixed in the second degree, retrodisplacement. I found the uterus slightly to the left of the mid line, and to the right of the tubo-ovarian region I found resistance and tenderness. The tenderness above described might be attributed to an ovarian condition, a tubal condition, or to some other condition due to the displacement of the uterus or possibly some inflammatory condition in the neighboring structures." He acquainted her with these findings and advised "that she place herself under the care of her home physician as her condition might require an operative procedure to cure her." An osteopathic physician examined and treated her at about the same time—"in the late winter of 1920." He testified that she came to him for an examination, primarily for an extremely nervous condition following an attack of the influenza, and marked constipation; that he "discovered a retroflexed uterus, also lying slightly to the left with an enlarged and hardened fundus, also tenderness along the course of the right tube extending to the ovary," gave her treatment for this condition, and "found it necessary to raise the uterus and get it back in position and support it with lamb's wool tampons;" and that she seemed to have a full knowledge of her condition. She died November 16, 1920, following an operation, the cause of death

being thus given in the attending physician's statement: "Inanition following fœcal fistulæ which in turn resulted from peritonitis as result of breaking up adhesions between retroflexed uterus and intestine, removal right ovarian tumor and fibroid on posterior wall of uterus." The purpose of the operation was to correct the misplacement of the uterus, the existence of which she stated to the doctor. He testified that the fœcal fistulæ were "caused by breaking up the adhesions that existed between the uterus and the bowels, in which the intestines were injured, making a leak finally that broke through. These adhesions were brought about by a small fibroid that existed in the uterus; I think that is what caused the adhesions. I do not think it would be possible for the adhesions to be caused by a retroflexed uterus against the intestines."

It is clear that at the time of her application the insured had a retroflexed uterus and knew of it, but the matter to be determined is whether the evidence compelled the conclusion that her trouble was a uterine disease and that she knew it was a uterine disease, within the meaning of the word as used in the application. The formal definitions of the word disease, found in the general and technical lexicons, seem broad enough to include a dislocated joint or a severed artery. That of Webster's International Dictionary is "An alteration in the state of body or of some of its organs, interrupting or disturbing the performance of the vital functions, or a particular instance or case of this." That of Appleton's Medical Dictionary is, "Any departure from, failure in, or perversion of normal physiological action in the material constitution or functional integrity of the living organism." The trial court was not asked to define the word and did not do so. A retroflexed or backward bent uterus would not seem to be a disease any more than a hernia is. The defendant's examining physician, however, testified that he would classify a retroflexed uterus as a disease if symptoms had developed from it, meaning by symptoms "something that would cause the patient some trouble"—"that would attract her attention to the condition." On the other hand, two doctors called by the plaintiff said that a woman would not necessarily have an ovarian or uterine disease if she had "a reflexed uterus lying slightly to the left, with an enlarged and hardened fundus, and tenderness along the right tube." There being conflicting evidence on the subject, the question whether the insured had a disease was one properly to be submitted to and determined by the jury.

2. The really vital issue, however, is whether the insured was conclusively proved to have known that her condition amounted to a disease in the sense in which the word was used in the application. Assuming that a retroflexed uterus which produces symptoms is properly described as a disease and is so classified by doctors, it does not at all follow that the insured knew of that usage or understood that the expression was employed in that sense in the question asked her. Whatever the word may mean when used with technical accuracy, to the lay mind it suggests something different from a displaced organ, and the distinction based upon the presence or absence of symptoms, however sound it may be, is one the knowledge of which is not necessarily to be imputed to those unlearned in medical terminology.

3. The question in the application, "On what dates and for what complaints have you been attended by a physician during the past three years?" was answered, "Dr. Watkins (the first doctor she consulted), Farmington, Mo. Influenza, Jan. 1920." The defendant urges that in omitting to name the osteopath, whom she consulted at about the same time, and in omitting to refer to the retroflexion of the uterus, the insured necessarily practiced fraud upon the company. The question did not, in terms at least, call for the number of doctors by whom she had been attended, or their names, although the instructions gave a version of it which did, and which is repeated in the briefs. It called only for the dates and complaints. The services of the two doctors were rendered practically at the same time, and it is readily conceivable that she saw no occasion for naming both of them. The month named—January, 1920—was that in which Dr. Watkins' treatments were begun, and in which six of them were given; he gave daily treatments from January 30 to February 3, inclusive, and treatments on February 13, May 12 and May 25. The claim made by the defendant in this connection and in others that in order to exercise good faith she was bound to make a full disclosure of all facts, even to the extent of volunteering information, is untenable. The medical questionnaire contained fifteen inquiries, several of them subdivided and one of them having thirty-three subdivisions. Fraud cannot be attributed to an applicant for supposing that it was only necessary to answer the questions asked. The omission to refer to the displacement of the uterus is not necessarily inconsistent with good faith. The evidence was that the two doctors referred to were consulted primarily for

influenza, or for a condition following influenza, and a physician testified that after an attack of "flu" a condition was frequently left like that described as "a retroflexed uterus lying slightly to the left, with an enlarged and hardened fundus, and tenderness along the course of the right tube." Moreover, it is possible, as the plaintiff suggests, that the insured understood the word "physician" to apply only to one in the general practice of medicine, conceiving an osteopath not to be covered by the term, on the theory that he treated only such troubles as displacements of various kinds, and these by manipulation. However erroneous such a conception may be, it would not be inconsistent with good faith.

4. To the question, "Are you now in good health?" the applicant answered "Yes," and this is relied upon as conclusive proof of a fraudulent intent. She of course knew that in a sense she was not in good health—in perfect physical condition. But it is entirely possible that she regarded the retroflexion of the uterus and the attending symptoms as sequalæ of the influenza, unpleasant and perhaps requiring even surgical treatment, but not of such character as to impair her general health or increase the risk, and that she understood "good health" to be so used as not to include matters of that sort. The phrase, while positive in form, is in a way a comparative term—it is not mathematically exact and leaves some latitude for opinion.

5. The jury were told that if the insured "returned untrue answers to material questions and knew at the time that they were untrue, the law implies an intention to deceive, but this implication can be rebutted, and if upon a consideration of all the evidence in the case you find that said answers were made in good faith, with no intention to deceive, then your verdict will be for the plaintiff." The defendant complains of the language making the implication rebuttable, and insists that if a statement were made with the knowledge that it was untrue there should be no recovery by the plaintiff. Assuming that a knowingly false answer may sometimes be conclusive proof of fraud, we regard the instruction given as proper in this case. Although the jury believed that the statement of the applicant that she was in good health was to her knowledge literally untrue, they were justified in returning a verdict for the plaintiff if they found that she thought the defect in her physical condition was not important enough to require a qualification of her answer. An instruction was properly refused which made

knowledge on the part of the insured that she had a uterine trouble equivalent to knowledge that she had a uterine disease. Complaint is made of the following instruction as placing the whole emphasis upon good faith without defining it, and making no reference to the possibility of evasion, fraud or suppression of facts; we think, however, that it sufficiently defined the issue.

"You are instructed that the law does not require an absolutely literal interpretation of the provisions in an application and policy of life insurance with respect to untruthful answers; and if you find that the said Olivia E. Peugh acted in good faith and honestly in making the answers set out above and had no purpose to conceal any fact which she would naturally suppose was contemplated by the questions, and that the answers were made without fraud or intention to deceive or suppress the facts, then such answers, even though not literally true, would not avoid the policies or defeat the liability of the defendant thereon. The test is the good faith of the deceased in making the answers she did."

Complaint is also made of an instruction that a misrepresentation in the application would not be material unless the fact misrepresented actually contributed to the death of the insured. The statute provides that "No misrepresentation made in obtaining or securing a policy of insurance on the life or lives of any person or persons, citizens of this state, shall be deemed material or render the policy void unless the matter misrepresented shall have actually contributed to the contingency or event on which the policy is to become due and payable." (Gen. Stat. 1915, § 5290.) The defendant argues, however, that the applicant's statement that she was in good health, and her omission to tell of her having been treated by the osteopath, related to matters of moral risk which could not in any event have contributed to her death and therefore were not within the operation of the statute. (*Becker v. Surety Co.*, 105 Kan. 99, 181 Pac. 549.) These misrepresentations, assuming for the moment that they were such, fell within the scope of the statute. They bore upon her condition at the time and affected the physical risk. Their whole importance was based on the fact that the matter misrepresented—the state of her health when she made the application—did contribute to her death. If she had been killed by a stroke of lightning, for instance, these misrepresentations would under the statute have been immaterial.

The testimony already referred to, given by two medical witnesses, that the condition of the insured described by the osteopath did not necessarily constitute a disease was objected to in one in-

stance on the ground that the witness had shown no knowledge of the subject and in both instances because the hypothetical question did not include all the symptoms shown by the evidence. The witness to whose testimony the first objection was made had said he was a practicing physician and had been engaged in surgery for fourteen years, which was a sufficient qualification. The hypothetical question included all the conditions described by the osteopath, and it was proper to frame a question upon that testimony alone. Moreover, the evidence was admissible as tending to contradict that of the doctor who said he would class a retroflexed uterus as a disease if any symptoms accompanied it. The witness first referred to was asked by the defendant on cross-examination whether the addition of other symptoms testified to would indicate the existence of a uterine disease. The sustaining of an objection to the question is complained of, but as it was not shown what the answer would have been the ruling is unavailable on review. (Civ. Code, § 307.) The court ruled out of the deposition of the doctor first consulted by the insured a statement that he had told her there might have to be an operation, but no prejudice could have resulted, for, as already indicated, his testimony that was admitted showed he had told her that "her condition might require an operative procedure to cure her." The court ruled out of the deposition referred to a statement that the witness doubted whether, at the time of his examination of the applicant, there would have been any other symptoms disclosing its existence if a tumor which was revealed by the operation had been then present, and an affirmative answer to the question "Would the removal of the right ovarian tumor and fibroid on posterior wall bear out the fact that the same was an existing condition which was responsible and evidenced by the resistance and tenderness by the right tubo region?" This ruling is complained of, but whether or not it was correct the evidence is not important enough to justify a reversal. A medical witness was asked whether he would say the death was due to an ovarian or uterine disease, if it resulted from the causes stated in the death certificate already referred to, and answered that he would say the cause was fœcal fistulæ. The question was objected to as not based on the facts shown to exist and the answer as not being responsive. Neither objection is well taken.

The jury found in answer to special questions that the insured at the time of her application did not know that she had a uterine

or ovarian disease and in fact did not have one, but that she knew she had a retroflexed uterus. For the reasons already stated, the first two findings were fair matters for the determination of the jury and the last was not inconsistent with the verdict.

The judgment is affirmed.

