No. 44,946

George L. Schneider, *Appellee* and *Cross-Appellant,* v. Wash-
ington National Insurance Company, *Appellant,* and *Cross-
Appellee.*

(437 P. 2d 798)

Opinion filed January 27, 1968.

*Gerald Sawatzky,* of Wichita, argued the cause, and *L. J. Bond,* and *Robert M.
Bond,* both of El Dorado, and *George B. Powers, John F. Eberhardt, Stuart R.*

Carter, Robert C. Foulston, Malcolm Miller, Robert N. Partridge, Robert M. Siefkin, Richard C. Harris, Donald L. Cordes, Robert L. Howard, Charles J. Woodin, Mikel L. Stout, Benjamin C. Langel, Phillip S. Frick, Jerry G. Elliott, and John E. Foulston, all of Wichita, were with him on the briefs for the appellant and cross-appellee.

Fred R. Vieux, of Augusta, argued the cause and was on the brief for the appellee and cross-appellant.

The opinion of the court was delivered by

KAUL, J.: This is an action to recover disability benefits under a health and accident insurance policy. The controversy stems from admittedly false answers to several questions in the application for insurance. The case was tried to a jury on the sole question whether plaintiff-appellee was disabled as a result of an accident. In a special verdict the jury found plaintiff totally disabled. Other issues were determined by the trial court in ruling on motions for summary judgment filed by both parties.

The defendant-insurer appealed, and the plaintiff-insured filed a cross-appeal from an order of the trial court denying plaintiff's motion to amend his petition by adding an additional cause of action for damages for "rough shadowing" by a private detective firm hired by defendant.

The principal points raised by both parties on appeal are aimed at pretrial rulings of the trial court which in effect overruled defendant's motion for summary judgment and sustained that of plaintiff as to all issues except that of plaintiff's disability.

Pertinent facts necessary for our disposition of the issues pertaining to the motions for summary judgment are gleaned from interrogatories and discovery depositions reproduced in the voluminous record.

Plaintiff, George L. (Lorenzo) Schneider, and his brother, Frank Schneider, owned and operated the Schneider Bros. Feed and Grain, Inc., in Augusta, Kansas. The business was incorporated with 100 shares of stock outstanding. Each of the brothers owned forty-nine shares, their mother and sister owned the two remaining shares. Frank was president and George treasurer of the corporation. The two brothers, as partners, were also engaged in some farming operations.

In May of 1960, Robert H. Bridewell, a local agent of defendant, called on the Schneider brothers to solicit insurance. He talked with both brothers in the office of their grain business. In the

course of the conversation Schneiders told Bridewell they once had policies with defendant but allowed them to lapse. The brothers also informed Bridewell they each had a problem of ulcers and inquired if they could get policies without an ulcer exclusion. Bridewell told them the company would not issue policies under those circumstances without an exclusion for ulcers. The brothers said they would not take policies under those circumstances and that ended the conversation about insurance on this occasion. After the May conference with the Schneiders, Bridewell attended a company convention and learned the previous underwriting policy had been changed and the company would now allow agents to take applications for the "Income Protector" policy on a rated basis on an impaired risk. Bridewell testified that, on learning of the company's change in underwriting policy in this regard, he again thought of the Schneider brothers as prospects.

On July 17, 1960, Bridewell again called on the Schneiders. There is a sharp disagreement as to what took place at this meeting. Bridewell says that after some discussion concerning the premium ratings, under which the policy would be written if purchased, he proceeded to fill out applications for both brothers. Bridewell states that he specifically inquired of plaintiff and inserted on the application form the answers obtained, which proved to be false. Plaintiff on the other hand, states the application was filled in by Bridewell without any consultation with or interrogation of plaintiff and even claims the application was filled out by Bridewell without plaintiff's knowledge. Plaintiff's brother, Frank, in an affidavit attached to plaintiff's motion for summary judgment, denies supplying any of the information to Bridewell pertaining to the false answers.

The sharp conflict, as to the taking of the applications by Bridewell, has persevered throughout the entire, lengthy course of this controversy and, except by inference drawn from the trial court's rulings at pretrial conferences, remains unresolved. Bridewell says that after he had filled out the application forms, plaintiff indicated some hesitancy as to whether he wanted the policy after all. At this juncture Bridewell left the unsigned, but otherwise completed, application forms in the Schneider office, and as he departed told the brothers he would return the next day. On the following day Bridewell returned to the Schneider office. He saw Frank but not the plaintiff. Frank told Bridewell they had decided to take the

insurance and had signed the applications. Frank gave Bridewell a check for the first month's premium with the applications. Bridewell then dated the applications, witnessed the signature, took the check, and sent the applications in to the company to see, as he testified, if it would issue the policies. Both policies were issued and Bridewell delivered plaintiff's policy, with the application attached, On September 13, 1960.

The signature affixed to the application is as follows:

"Schneider Bros. Grain & Feed Inc.
"/s/ George L. Schneider, Tres.
"Signature of Applicant

"Witnessed by
"/s/ Bob Bridewell
"Agent 4103-42 Code or D. No."

In his pretrial deposition, plaintiff denied the signature was his, and claimed he didn't know the policy was being applied for. He testified that later he gave a check to Bridewell for the balance of the premium, necessary to bring the policy up to the renewal date.

It is conceded that the signature was not plaintiff's. Defendant takes the position that plaintiff's brother, Frank, signed the application and was so authorized by plaintiff. Plaintiff's position is not clear for it appears that he has neither affirmed nor denied his name was signed by Frank. Generally an insured is bound by an application signed by his authorized agent. (12 Appleman, Insurance Law and Practice, § 7306, pp. 428-430; 29 Am. Jur., Insurance, § 724, p. 984.) If an agent is unauthorized a principal should promptly repudiate his unauthorized acts. (*Will v. Hughes,* 172 Kan. 45, 238 P. 2d 478; and *Isaacs v. Motor Co.,* 108 Kan. 17, 193 Pac. 1081.)

Plaintiff stated that Bridewell delivered the policy but that he did not look at it or the application. In this connection plaintiff was questioned and he answered as follows:

"Q. Do you remember my question? Did you ever say to Mr. Bridewell 'there were wrong answers to this application'?
"A. No, I never read the application.
"Q. Did you ever write Washington National and tell them you didn't sign the application and the answers therein were wrong?

. . . . . . . . . . . .

"Q. Did you ever go ahead and inform them of that fact?
"A. No.
"Q. When Mr. Bridewell brought the policy out why didn't you say to him: 'I didn't want that, I didn't sign that application, I don't want it'?

. . . . . . . . . . . .

"Q. Why didn't you say that to him?
"A. It never entered my mind. I don't know why I didn't say it.

"Q. To the contrary, you went ahead and wrote a check for the rest of the premium, didn't you?

"A. That's right.

.    .    .    .    .    .    .    .    .    .    .    .    .

"Q. Did your brother have authority from you, as your agent to execute this application and request the insurance from the Washington National?

"A. We had a verbal agreement, whatever he done was all right and whatever I done was all right.

"Q. So your answer is 'yes'?

"A. If we made a deal that was a loss, we shared the loss.

"Q. Your answer would be 'yes' that he had authority?

"A. Verbal authority."

On October 24, 1960, plaintiff made application to defendant for monthly benefits. Defendant commenced paying plaintiff disability benefits of $400 per month, effective as of September 1960. The payments were first based on plaintiff's preliminary report of disability in which plaintiff stated he was injured when he slipped while lifting a sack of feed on September 8, 1960. He stated that he quit work on September 14, 1960. The attending physician's statement, attached to plaintiff's preliminary report of disability, was made out by Glenn E. Colvin, D. C. His report disclosed the nature of sickness or injury to be "Right rotation of 2nd, 3rd, & 4th lumbar vertebra involving sciatic nerve." The symptoms first appeared on September 8 and Dr. Colvin was consulted on September 9, 1960.

Dr. Colvin further stated "Mr. Schneider is totally disabled as of September 14, 1960, and will be for an undetermined length of time."

Plaintiff was examined on October 26, 1960, by Dr. Harold S. Bowman, an orthopedic surgeon. Dr. Bowman found plaintiff was suffering from a "herniated intervertebral disc at L4.15 on the right side." Dr. Bowman continued as plaintiff's attending physician. On April 10, 1961, Dr. Bowman reported to defendant that plaintiff might be able to return to work at his job of managing his store on a part time basis providing there is such work available to him. The report was followed on April 25, 1961, by a letter to defendant from Dr. Bowman in which he stated plaintiff would be able to do only supervisory work at that time. Based on Dr. Bowman's report, and on the theory plaintiff was only indemnified for disability to perform management duties under the provisions of the policy and representations in the application, the defendant ceased payments to plaintiff on August 4, 1961, having paid a total of $4,280.

This action was filed on July 1, 1963. On September 5, 1963, plaintiff filed his second amended petition in which he alleged the purchase of the policy in question, the payment of an initial premium

in the amount of $235.80; that he suffered an accidental injury to the lower portion of his back while lifting bags of grain on September 8, 1960, and had been continuously totally disabled thereafter. Plaintiff further alleged that he had been under the regular care of a qualified physician and that he had filed proof of loss as provided for under the terms of the policy. The insurance policy, without the application, was attached to the petition. The defendant filed its original answer in the form of a general denial on September 18, 1963. Defendant specifically denied plaintiff was totally disabled.

Pretrial discovery proceedings were commenced in August of 1963, the first being an attempt by defendant to take the depositions of Dr. Bowman and Dr. Cline D. Hensley. This action was met by an application for a restraining order and injunction filed by plaintiff on August 20, 1963. From this point on, through the pretrial and pleading stages of the case, most of the actions taken by either party were contested. As a result many hearings came before the trial court involving the various controversies arising between the parties in connection with pretrial proceedings.

As information was developed by the parties, in the course of taking the various interrogatories and discovery depositions, pleadings were amended and additional pleadings were filed. The case was bogged down in a morass of pretrial proceedings, motions to suppress or restrain, motions to amend pleadings, and controversies in connection therewith until July 12, 1965, at which time the parties appeared for the first pretrial conference.

The case was first assigned to Judge Benson who determined all matters presented to the court prior to the pretrial conference of July 12, 1965. At one stage of the case plaintiff filed an application for a change of judge which is not reproduced in the record. The application was denied. Nevertheless, under circumstances not set out in the record, the pretrial conference came before Judge Reynolds, the other judge of the district court of Butler County, and all proceedings thereafter were had before him.

The record had become voluminous when the pretrial conference stage was reached. Pertinent portions of the multitude of interrogatories and discovery depositions will be noted and further reference to details of the pleadings will be made in the course of the opinion. At this point it will suffice to say that the issues and positions of the parties were generally finalized by the motions for

summary judgment, with affidavits attached, filed by each party and the statements of position by respective counsel.

Originally, plaintiff took the position that there was no application and as noted attached only a copy of the policy to his petition. In his affidavit filed with his motion for summary judgment, plaintiff admits the application was attached to the policy when delivered and a copy of the application was attached to his affidavit. He also admits that a number of answers, shown in the application, were false but avers they were filled in by agent Bridewell without plaintiff's knowledge.

By the time the case had reached the pretrial conference stage defendant had filed a cross-petition asking for a recision of the policy and for judgment for the amount of benefits paid, less premiums received, on the grounds the policy was void by reason of false statements in the application. Defendant also amended its answer to conform in this respect to its cross-petition. Plaintiff had filed an answer to defendant's cross-petition alleging the application form was filled in by Bridewell without plaintiff's knowledge and further denied that the application materially affected the risk insured. Later plaintiff amended his answer [reply] to defendant's cross-petition pleading waiver and estoppel. Defendant filed a reply to plaintiff's answer to its cross-petition alleging that the matters contained in the false answers in the application affected the risk and hazard to be assumed; that defendant would not have issued the policy if true answers had been fully set out in the application; and that defendant had no knowledge of or means of ascertaining the falsity of such answers prior to the taking of plaintiff's deposition. Defendant asked recision of the policy under G. S. 1961 Supp., 40-2205 (C), (K. S. A. 40-2205 [C]). If the policy was valid and not subject to recision then defendant took the alternative position that plaintiff's disability resulted from sickness rather than accident.

At the first pretrial conference, on July 12, 1965, the trial court heard arguments of counsel and their comprehensive statements of position. The motions for summary judgment of both parties were taken under advisement, the parties submitted briefs and appeared for a second pretrial conference on September 7, 1965, when the court announced its rulings. There was no formal pretrial order or journal entry filed. The rulings of the court must be gleaned from a colloquy between court and counsel at the second pretrial confer-

ence. The court ruled the policy valid as a matter of law, notwithstanding the admittedly false answers in the application, and held the only issue to be tried was whether plaintiff was totally disabled. The effect of this ruling precluded defendant's alternative position that, if the policy was valid, plaintiff's disability, if any, resulted from sickness. The trial court's reasoning in arriving at its conclusion is not disclosed.

The real issue in this case concerns the legal effect of the false answers in the application. Therefore, we shall consider first the trial court's rulings on the motions for summary judgment. Most of the trial errors complained of by defendant are related to those rulings.

We will state, at the outset, that the posture of this case at the pretrial juncture was not such that would warrant the disposal of the issue of the legal effect of the false answers by way of summary judgment under the provisions of K. S. A. 60-256 and the rules governing the application thereof announced by this court.

Since the enactment of 60-256, *supra*, this court has repeatedly said that before a motion for summary judgment may be rendered it must be shown conclusively that there is no genuine issue as to material facts. (*Supreme Petroleum, Inc. v. Briggs*, 199 Kan. 669, 433 P. 2d 373; *Collins v. Meeker*, 198 Kan. 390, 424 P. 2d 488; *Green v. Kaesler-Allen Lumber Co.*, 197 Kan. 788, 420 P. 2d 1019; *Secrist v. Turley*, 196 Kan. 572, 412 P. 2d 976; *Noll v. Schnebly*, 196 Kan. 485, 413 P. 2d 78; and *Brick v. City of Wichita*, 195 Kan. 206, 403 P. 2d 964.) It has been said that on motion for summary judgment the court's function is not to decide issues of fact, but simply to determine whether they exist and any doubt is resolved against the movant. (*Wilson v. Deer*, 197 Kan. 171, 415 P. 2d 289; and *Herl v. State Bank of Parsons*, 195 Kan. 35, 403 P. 2d 110.)

In this case both parties filed motions for summary judgment. It follows that each, in defending against the motions, is entitled to a liberal construction of the pleadings. (*Supreme Petroleum, Inc. v. Briggs*, supra; *Price, Administrator v. Holmes*, 198 Kan. 100, 422 P. 2d 976; and *Herl v. State Bank of Parsons*, supra.) Furthermore, any doubt as to the existence of an issue of fact must be resolved against movant and the opponent's evidence is entitled to the benefit of all reasonable inferences therefrom. (*Green v. Kensinger*, 199 Kan. 220, 429 P. 2d 95; and *Jarnagin v. Ditus*, 198 Kan. 413, 424 P. 2d 265.)

In his discovery deposition agent Bridewell positively states that he filled out the application with the specific answers given by plaintiff. Bridewell's testimony is vehemently denied by plaintiff. As will be pointed out, this question of fact alone precludes disposition of the issues presented by a summary judgment. This point will be discussed together with defendant's further contention that it was entitled to a summary judgment for recision of the policy.

Before proceeding with the reasons for our conclusions on this point, we pause to describe the policy of insurance and the application upon which it was issued. Several provisions of the policy are pertinent in connection with points on appeal with respect to the alleged trial errors. Other provisions of the policy and the application are of vital relevance to the issues arising from the rulings on motions for summary judgment.

The policy issued was entitled "Income Protector." The general indemnities were monthly sickness and accident disability benefits of $400, within specified limitations and qualifications. The initial annual premium was $235.80. An amendment was attached providing for a monthly payment of premium at the rate of $19.76 per month. Schedules of indemnity for specific total losses and for specified injuries were set out in Parts 1 and 4, which are not involved here.

We shall set out those provisions of the policy material to this action. On the first or cover page of the policy general indemnity provisions of the contract pertinent herein are as follows:

"The Company hereby insures the person designated as the Insured in the Schedule on page four against specified losses and disability which commences while this policy is in force resulting directly, and independently of all other causes, from injury and disability which commences while this policy is in force resulting from sickness, subject, however, to a reduction in benefits at age 65 as provided in paragraph 2 of Part 9 and to all of the other provisions and limitations of this policy.

"Definition of Injury. The term injury as used in this policy shall mean an accidental bodily injury occurring while this policy is in force.

"Definition of Sickness. The term sickness as used in this policy shall mean a sickness or disease contracted while this policy is in force.

. . . . . . . . . .

"*This policy is issued in consideration of the statements in the application, a copy of which is attached and made a part of this policy,* and the payment of the Initial Premium which will maintain this policy in force from the Policy Date at twelve o'clock noon, Standard Time at the residence of the Insured, until twelve o'clock noon, such Standard Time, on the First Renewal Date, and

thereafter for such further periods as the renewal premiums paid will maintain this policy in force.

"The indemnities of this policy are set forth in the Schedule on page four. The Schedule and all of the provisions and limitations contained on the following pages are a part of this contract as fully as if recited over the signature hereto affixed." (Emphasis added.)

The accident disability benefits were set out in Part 2 on page 2 of the policy. The pertinent provisions for benefits for total or partial disability read as follows:

"Total Disability. If injury shall totally and continuously disable the Insured so as to prevent him from performing every duty pertaining to his occupation, the Company will pay at the rate of the Monthly Accident Indemnity for the period of such total disability beginning with the day of disability specified in the Schedule, but not exceeding 24 months during any one period of disability.

"If, after the payment of the Monthly Accident Indemnity for 24 months, such injury shall totally and continuously disable the Insured so as to prevent him from performing every duty pertaining to his occupation or any other gainful occupation for which he is reasonably qualified by education, training or experience, the Company will continue to pay at the rate of the Monthly Accident Indemnity so long as the Insured shall live and remain so disabled.

"Partial Disability. If injury shall continuously disable the Insured so as to prevent him from performing one or more important duties pertaining to his occupation, the Company will pay at the rate of one-half of the Monthly Accident Indemnity for the period of such partial disability beginning with the day of disability specified in the Schedule or immediately following a period of compensable total disability, as the case may be, but not exceeding 6 months during any one period of disability.

"Indemnity will not be paid under the preceding paragraphs of this Part if the Insured is not under the regular care and attendance of a legally-qualified physician other than himself during the period of such total or partial disability."

Material provisions pertaining to disability benefits for confining and nonconfining sickness are recited in Part 3 of the policy as follows:

"Total Disability; Confining or Non-Confining Sickness. If sickness shall totally and continuously disable the Insured so as to prevent him from performing every duty pertaining to his occupation, the Company will pay at the rate of the Monthly Sickness Indemnity for the period of such total disability beginning with the day of disability specified in the Schedule, but not exceeding 24 months during any one period of disability.

"Total Disability; Confining Sickness Only. If, after the payment of the Monthly Sickness Indemnity for 24 months, such sickness shall totally and continuously disable the Insured so as to prevent him from performing every duty pertaining to his occupation or any other gainful occupation for which he is reasonably qualified by education, training or experience, and necessarily cause him to be confined indoors, the Company will continue to pay at the rate

of the Monthly Sickness Indemnity for the remaining period of such total disability and confinement, but not exceeding 96 additional months during any one period of disability.'

Regular care and attendance of a physician during the period of nonconfining or confining total disability was required under the sickness disability benefit provisions.

Item 3 of the "Exceptions and Reductions" provisions read:

"Loss or disability caused by any kind of hernia, whether accidentally caused or otherwise, shall be classified as sickness."

As we have indicated, plaintiff attached a copy of the application to his affidavit in support of his motion for summary judgment. In his affidavit, plaintiff sets out the answers to questions which he claims were inserted by Bridewell. The answer to question No. 1 is that plaintiff is 5 feet, 11 inches tall and weighs 160 pounds. Plaintiff states this answer is false and knowingly made by the agent. The truth being that plaintiff is 5 feet, 9 inches tall and his weight not in excess of 140 pounds. Plaintiff states that as to question No. 4 of the application pertaining to plaintiff's duties the words "Executive Management" were inserted by the agent on his own initiative without regard to truth or falsity and without consultation of plaintiff.

Question No. 8 was whether applicant had ever made claim for or received indemnity, including government compensation, on account of any injury or illness. Plaintiff states the agent answered this question "No" without interrogating plaintiff and that the answer is false. Plaintiff further states that he suffered an accident on September 8, 1960, and that the policy of insurance with the application attached, containing the false answers made and entered by the agent, was not delivered until September 13, 1960, and therefore plaintiff could not have known of said false answers until after the accident. Plaintiff further states in his affidavit that the nature of the business was such that no person was used in the sole capacity of "Executive Management" and that he and his brother, Frank, and Carl Malott all did heavy manual labor.

In addition to the false answers to questions Nos. 1, 4 and 8, above referred to, the defendant claims that the answer of $1,000 per month as average earnings to question No. 5 was a false answer. The evidence disclosed plaintiff's annual income during the years 1956-1964 varied from $631 in 1960 to as much as $11,969 in 1961. Part of his income was derived from farming operations.

The application further reflects section $(h)$ of question No. 11, followed by questions Nos. 12, 13 and 14, as follows:

"$(h)$ Any surgical operation?   .   .   .   Yes

"(If answer is 'yes' to any of the above, state nature, date, period of disability, doctor's name, address and result.)

"Treated For ucler 1952

"Operated No Recurrence

"Dr.

"12. When and for what have you been under observation or had medical or surgical advice or treatment or been hospital confined during the past five years? (Give dates, name of doctor and hospital, ailment, period of disability)

"No.

"Have you completely recovered? Yes.

"13. To the best of your knowledge and belief are you now in good health and free from physical impairment or deformity? No (If not, give full particulars.)

"14. Do you represent that all of the answers herein are true and complete? Yes."

With reference to the "No" answer to question No. 12, plaintiff testified that in 1959 he suffered some chest pains and was taken to a hospital by ambulance and was given some tests during his stay in the hospital.

The significance of the "No" answer to question No. 13 will be discussed later.

In his counter-affidavit defendant's agent states that on July 16, 1960, in the presence of both Frank and George L. Schneider he filled out the two applications by asking each one the questions on the application blanks and that the answers written on the application forms are the answers each gave. Bridewell further states in his affidavit that as to each question the answer was inserted as given by George L. Schneider and if it was false it was because George gave the answer falsely.

With issues developed as related we turn to the specific points raised by both parties on appeal in connection with the trial court's rulings on the motions for summary judgment. The issues in question are generally determined by the legal effect to be given the false answers under the circumstances existing.

Defendant insists that because of the admittedly false answers in the application it was entitled to summary judgment under the provisions of G. S. 1961 Supp., 40-2205 which, in pertinent part, read as follows:

"(A) The insured shall not be bound by any statement made in an applica-

tion for a policy unless a copy of such application is attached to or endorsed on the policy when issued as a part thereof. . . ."

. . . . . . . . . . . . . .

"(C) The falsity of any statement in the application for any policy covered by this act may not bar the right to recovery thereunder unless such false statement materially affected either the acceptance of the risk or the hazard assumed by the insurer."

The legislative history of part (C) above, dealing with misrepresentations in an application for insurance, was related in the recent case of *Martin v. Mutual of Omaha Ins. Co.,* 198 Kan. 135, 422 P. 2d 1009. The provision referred to was enacted in 1951 (L. 1951, Ch. 296, Sec. 5) as a part of the Uniform Policy Provisions for health and sickness insurance and was in effect at the time of the making of the application for the policy of insurance in question. It has since been amended in 1963 (K. S. A. 40-2205[C]) and a further proviso was added in 1965 (K. S. A. 1965 Supp. 40-2205[C]). Neither the amendment nor the proviso is material to the issues before us.

Defendant cites a long line of decisions where judgment was entered as a matter of law by a trial court and affirmed by this court, or where this court reversed and directed the entering of a judgment for an insurer because of misrepresentations as to material matters in the application, which either affected the acceptance of the risk or the hazard assumed by the insurer, or actually contributed to the contingency or event on which the policy is to become payable. Some of the cases were decided under the misrepresentation statute of the insurance code, relating to life insurance companies, now appearing as K. S. A. 40-418, which requires the misrepresentation to have actually contributed to the contingency or event on which the policy is to become due and payable. Prior to the enactment of the 1951 provision, governing here, this court held that where health and accident policies provided an "indemnity for loss of life" such policies were within the purview of the life insurance provision. (See 40-418, *supra; Becker v. Surety Co.,* 105 Kan. 99, 181 Pac. 549; *Elliff v. Inter-State Business Men's Acc. Co.,* 153 Kan. 177, 109 P. 2d 92.) For purposes of our immediate discussion, decisions under both statutes are pertinent as the differences pertain only to materiality.

Defendant's position is untenable here for the reason, as we have noted, the responsibility for furnishing the misrepresentations in this case remained an open question of fact when the motions for summary judgment were presented to the trial court. For the same

reason summary judgment for plaintiff on this issue was erroneously rendered.

In cases where the truth of the representations or the fact surrounding the taking of the application are in dispute the questions presented are for a jury's determination. (*Kansas Ins. Co. v. Berry,* 8 Kan. (2d Ed.) * 159; *Insurance Co. v. Despain,* 77 Kan. 654, 95 Pac. 580; *Kovac v. Sons and Daughters of Justice,* 112 Kan. 178, 210 Pac. 338; *Galloway v. Insurance Co.,* 112 Kan. 720, 212 Pac. 887; *Scott v. National Reserve Life Ins. Co.,* 143 Kan. 678, 56 P. 2d 76; and *Jackson v. National Life and Acc. Ins. Co.,* 150 Kan. 86, 90 P. 2d 1097.)

In cases cited by defendant the facts surrounding the making of the application were either undisputed, admitted, or predetermined by a trier of fact. In this case those facts are undetermined.

Defendant cites *Martin v. Mutual of Omaha Ins. Co.,* supra, in which judgment was entered as a matter of law for insurer because insured had misrepresented a diabetic condition. There was no dispute as to the insured making the misrepresentation in question.

Defendant relies heavily on *Minear v. Benefit Association of Railways Employees,* 169 Kan. 199, 218 P. 2d 244, where an order of the trial court overruling insurer's demurrer to insured's evidence was reversed by this court because false answers concerning insured's health were admittedly made, knowingly and jointly, by the insured and the agent of insurer. This court rejected the assertion of the insured that, even though the false answers were knowingly made, participation therein by insurer's agent amounted to a waiver.

The decision in *Minear* appears to be based on the sound reasoning that an agent, when in collusion with the insured, is in fact the agent of insured rather than insurer. For a discussion of this principle and its application see 45 C. J. S., Insurance, § 692, pp. 644-646.

The decision in *Minear* is no aid in solving the issue here. In this case there is no evidence of collusion or joint action on the part of agent and insured, the contrary exists; their respective positions as to making the application are diametrically opposed, either the agent on his own or the insured is responsible for the false answers.

In *National Reserve Life Ins. Co. v. Jeffries,* 147 Kan. 16, 75 P. 2d 302, a trial court's judgment for insured was reversed with directions to enter judgment for insurer because misrepresentations pertaining to a hypertension condition suffered by insured was found to be

material. The case was tried to the trial court which found as a fact the application was filled out and executed by the insured.

In *Giacoma v. Bankers Indemnity Ins. Co.*, 138 Kan. 226, 25 P. 2d 362, a judgment of the district court was reversed with directions to enter judgment for insurer because of a misrepresentation as to a sinus infection which was found material to the acceptance of the risk. The insured did not deny making the misrepresentation but argued it was not material.

In *Brown v. Metropolitan Life Ins. Co.*, 146 Kan. 300, 69 P. 2d 1110, it was held the insurer's motion for a directed verdict should have been sustained where a policy lapsed for nonpayment of premiums; was reinstated on the application of the insured, where misrepresentations undisputedly made by insured as to illness and consultations with physicians, since the date of the original policy were found to materially affect the risk assumed.

On the other hand this court has held that where the agent, without making inquiry of the applicant and without applicant's knowledge, enters a false answer as to a matter materially affecting the assumption of the risk or where the agent enters false answers contrary to the facts stated by the insured, the insurer cannot take advantage of the false answers. The rule is stated in *Cooley v. National Life & Acc. Ins. Co.*, 172 Kan. 10, 238 P. 2d 526, as follows:

"The rule in this state is that an insurance agent in making out an application for insurance acts as the agent of the company and not of the applicant, and if the applicant makes truthful answers to the questions propounded, the company cannot generally take advantage of false answers entered by the agent contrary to the facts as stated by the applicant. Applications of the rule, not limited to life insurance cases, have been made in *Insurance Co. v. Gray*, 43 Kan. 497, 23 Pac. 637, 8 L. R. A. 70, 19 Am. St. R. 150; *Broady v. Fire Association*, 94 Kan. 245, 146 Pac. 343; *Shinn v. Benefit Association*, 102 Kan. 134, 169 Pac. 215; *Van Ross v. Metropolitan Life Ins. Co.*, supra; *Carroll v. National Fire Ins. Co.*, 136 Kan. 580, 16 P. 2d 467; and cases cited in the above. The rule stated represents the great weight of authority. See annotations in 43 A. L. R. 527, 81 A. L. R. 833, 117 A. L. R. 790 and 148 A. L. R. 507. See also 29 Am. Jur. 641 and 45 C. J. S. 179. No reason is suggested, and we know of none, why an applicant for insurance, who is not asked a question contained in the application, but to which an agent enters a false answer is not entitled to a rule as favorable as that stated. Appellee's evidence was sufficient under the above rule and the trial court did not err in overruling the appellant's demurrer to it." (pp. 15, 16.)

In *Cooley* special questions were submitted to the jury which found specifically the applicant did not give the answers inserted

by insurer's agent on the application. It is also worthy of note that, as in our case, the application was attached to the policy, the basis for the insurance thereof and a part of the contract.

The rule adhered to by this court in *Cooley* is stated in 17 Appleman, Insurance Law and Practice, § 9401:

"An insurer is estopped from setting up a defense of fraud or negligence on the part of the insured in answering application questions, where such fraud or negligence was on the part of the insurer's agent. This rule applies with particular force where the false answers are inserted by the agent without the knowledge of the applicant, regardless of whether such statements be considered representations or strict warranties. Thus, where an application is prepared without even consulting or interrogating the insured, and the insured had no knowledge of the making of such statements, much less their verity, an estoppel is certain to arise.

"Likewise, an insurer waives or is estopped to rely on representations contained in an application where the agent fills in the application without propounding any of the questions to the insured. Where an agent assumes the responsibility for answering the questions asked in the application, and answers falsely or incorrectly without the applicant having made any statements in connection therewith or knowing the manner in which they were answered, the insurer will be estopped to claim that the representations were false or incorrect. The insured cannot be called upon to bear the consequences, where the application is filled in by the agent from his own knowledge or from information in his possession." (pp. 7, 8.)

In the *Cooley* opinion a careful distinction is made between the facts and those reflected in *Minear* and *Priest v. Life Insurance Co.,* 116 Kan. 421, 227 Pac. 538, where false answers were knowingly made by the applicant and the agent knew of their falsity.

*Cooley* follows the rule stated in *Van Ross v. Metropolitan Life Ins. Co.,* 134 Kan. 479, 7 P. 2d 41, wherein it was held:

"A life insurance agent in making out an application for insurance acts as the agent of the insurance company and not of the applicant, and if the applicant makes proper and truthful answers to the questions propounded the company cannot generally take advantage of false answers entered by the agent contrary to the facts as stated by the applicant." (Syl. ¶ 2.)

See, also, *Blades v. Insurance Co.,* 116 Kan. 120, 225 Pac. 1082; *Moreland v. Security Benefit Association,* 112 Kan. 587, 212 Pac. 93; *Shinn v. Benefit Association,* 102 Kan. 134, 169 Pac. 215.

The defendant argues that even though, as plaintiff claims, the answers were inserted by Bridewell the delivery of the policy, with application attached, to plaintiff and his retention thereof makes those answers binding upon him and requires judgment for defendant.

In support of its argument defendant cites 17 Appleman, Insurance Law and Practice, § 9405, p. 25, where it is stated:

"Where an application is attached to a policy and the policy is accepted and retained by the insured, the general rule is that he is conclusively presumed to have knowledge of its contents and to have ratified any false statements therein, so that he is estopped to claim that he did not make such statements, or that he gave true information and that such answers were those of the insurer's agent, . . ." (p. 29.)

Defendant directs our attention to *Comer v. World Insurance Co.*, 212 Ore. 105, 318 P. 2d 916, and *Martin v. Ore Insurance Co.*, 232 Ore. 197, 375 P. 2d 75, wherein the Oregon Supreme Court in construing a statute, similar to ours, applied the rule quoted in Appleman, *supra*.

We note, however, the following section, 9406, in Appleman, discloses that other jurisdictions have followed a doctrine more lenient to an insured. We quote therefrom as follows:

"An applicant has no absolute duty to read a policy in anticipation of fraud or mistake of an agent, so that even though the application contains a warranty that all answers to questions were correct, this has been held only a warranty that the answers actually made by the insured were correct, and not that the agent had correctly transcribed them. Nor would the fact that the application recites that the falsity of answers bars recovery require the insured to read his application to see if the agent correctly wrote his truthful answers therein. The mere fact that an applicant signs the application in good faith without reading it has been considered not such negligence as would render him liable for the agent's fraud or mistake in inserting answers false in character, and would not preclude recovery under this rule. Such failure to read would not, therefore, necessarily be a bar to recovery.

"An insured has a right to presume that the policy received by him is in accordance with his application, and his failure to read it will, under this rule, not relieve the insurer or its agent from the duty of so writing it. . . ." (pp. 31, 32.)

It must be conceded there is a split in authorities as to the duty of an insured to read over his policy and application, if attached, to ascertain whether it has been issued on false information supplied insurer by its agent. (45 C. J. S., Insurance, § 732, p. 741, 29A Am. Jur., Insurance §§ 1070, 1071, pp. 236-238.) From what was said by this court in *Cooley*, with reference to where an agent, without making inquiry and without applicant's knowledge, enters a false answer in the application puts this state in the fold of those jurisdictions which impose a more lenient application of the rule as expressed in Appleman, *supra*. Applying what has been said to the case at hand, if the facts are found to be, as claimed by plaintiff,

that Bridewell inserted the false answers without inquiry of either plaintiff or his brother, Frank, acting as plaintiff's agent, absent proof of bad faith or fraud on the part of plaintiff, the policy is not subject to recision. It must be noted here, the policy and attached application were not delivered until after the injury upon which claim was filed. If, on the other hand, the application was taken, as claimed by defendant, the policy is subject to recision if the misrepresentations are material to defendant's assumption of the risk and have not been waived by defendant's subsequent issuance of the policy and payment of monthly benefits.

First, with reference to the materiality of the admittedly false statements, we believe each falls within the broad concept of materiality expressed in our statute (G. S. 1961 Supp. 40-2205), in effect at the time. As we have indicated, prior to the 1951 enactment, the matter misrepresented to be deemed material must have actually contributed to the contingency or event on which the policy was to become due and payable (K. S. A. 40-418), and then by amendment in 1963 (K. S. A. 40-2205 [C]), the scope of materiality was again limited to a false statement that actually contributed to the contingency or event on which the policy is to become due and payable. Generally the test of materiality under a statute, such as ours, is whether the misrepresentation could reasonably be considered to be material in affecting the insurer's decisions as to whether or not to enter into the contract in estimating the degree or character of the risk, or in fixing the premium rate thereon. (45 C. J. S., Insurance § 477, p. 204; 12, Appleman, Insurance Law and Practice, § 7294, p. 403.)

We shall not burden this opinion with a discussion of the materiality of each false answer given in this case. We believe it suffices to say that under the broad concept of materiality expressed in our statute, the misrepresentations must be said as a matter of law to materially affect either the acceptance of the risk, or the hazard assumed by the insured. Authority that false statements concerning occupation and duties of employment, earnings and income, medical advice and hospitalization, and previous health conditions may be found in 45 C. J. S., Insurance, § 477, pp. 204-207, and in 7 Couch on Insurance, 2d, Chapter 37. In this case plaintiff does not seriously contend that any of the admittedly false answers in question are immaterial. Plaintiff's position throughout the course of the proceedings is that he did not make them.

In his deposition Earl J. Borgeson, underwriter for defendant, testified that had the true facts regarding plaintiff's occupation, hospitalization and income been given, no policy would have been issued.

Plaintiff argues that irregardless of how the false answers became inserted defendant waived its right of forfeiture by issuing the policy, accepting the initial premium, and paying monthly benefit payments on the accident claim.

Defendant on the other hand argues there could be no waiver or estoppel involved because defendant was ignorant of the false answers when the policy was issued and during the period when monthly benefits were paid.

Defendant correctly argues that waiver is the intentional relinquishment of a known right. With respect to the principles of waiver and estoppel, as applied to the law of insurance this court held in *Marett v. World Fire & Marine Ins. Co.*, 160 Kan. 125, 160 P. 2d 664:

> "As used in the law of insurance, a waiver is an intentional relinquishment of a known right and is a voluntary act, while elements of estoppel are the misleading of a party entitled to rely on the acts or statements in question and a consequent change of position to his detriment.
>
> "It is the general rule that where an insurer, with knowledge of facts warranting forfeiture, enters into negotiations after loss which recognize continued validity of the policy and induce the insured to incur trouble or expense under the belief the loss will be paid, the forfeiture is waived." (Syl. ¶¶ 1, 2.)

It was further stated in the opinion:

> ". . . There is a further argument that forfeiture must be promptly asserted, and that may be conceded. But it can only be asserted effectively when the moving party is in possession of facts and evidence that in event of litigation, he can prove his ground for forfeiture. That situation has already been sufficiently treated. While equity does not favor forfeiture, it displays no kindlier feeling for estoppels. Insofar as waivers are concerned they only come into being when a party, in full possession of the facts, relinquishes a known right." (p. 137.)

The rules relating to waiver and estoppel stated in *Marett* are those generally accepted. (16 Appleman, Insurance Law And Practice, § 9081, p. 594.)

Was there sufficient evidence of knowledge by defendant of the falsities as to serve as a basis for the application of waiver? The question cannot be resolved at this state of the case. Sufficiency of knowledge or possession of information imposing a duty of further investigation, unless conclusively established by the evidence, pre-

sents a question for the trier of facts. (1 Couch on Insurance, 2d, § 11:26, p. 501; 56 Am. Jur., Waiver, § 23, p. 125.) There is some evidence of knowledge on the part of defendant's underwriter, Borgeson, whose authority is unquestioned. In his deposition Borgeson admits the company files contained a previous application of plaintiff, made in 1957, and an Inspection Report by the American Service Bureau which reflect discrepancies from statements in the present application.

With respect to the "No" answer to question No. 13, as to applicant's belief that he was not in good health, Borgeson admitted that issuing the policy without further investigation was an underwriting oversight. He later testified, however, that from his underwriting experience an investigation would have resulted in a correction to "Yes" in view of the negative answers to medical or hospital treatment during the last five years in question No. 12.

Requirements of knowledge to serve as a basis for a waiver or estoppel are described in general terms in 45 C. J. S., Insurance, § 696, p. 656:

"The knowledge of the person whose acts are relied on to establish a waiver or estoppel must be of the essential facts necessary to enable a person of ordinary prudence and judgment to act understandingly, . . ."

A comprehensive discussion of the subject may be found in 17 Appleman, Insurance Law And Practice, §§ 9482 and 9483, pp. 141-151, and §§ 9494 and 9495, pp. 180-188.

Whether waiver is an issue in this case depends upon a determination of the underlying question of fact as to how the application was made, if it is an issue, sufficiency of knowledge is a question for the jury under appropriate instructions.

Plaintiff argues the issue of false answers in the application and the issue of sickness, presented by defendant, were not raised in the pleadings. In addition to what has been hereinbefore said on this subject we call attention to the provisions of K. S. A. 60-215 (b) which read:

"When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made at any time, even after judgment; but failure so to amend does not effect [affect] the result of the trial of these issues. . . ."

The subsection quoted above is identical with the corresponding part of Federal Rule No. 15. The import of the rule is discussed in

1A Barron and Holzoff, Federal Practice & Procedure, § 449, p. 781. We quote in part:

". . . Issues not raised by the pleadings which are tried by the express or implied consent of the parties, are treated in all respects as if raised in the original pleadings. . . ."

A further discussion is found in Gard, Kansas Code of Civil Procedure Annotated, § 60-215(*b*), p. 82.

Pretrial rulings of the trial court cannot preclude a review on appeal by this court. (*Campbell v. Nako Corporation,* 198 Kan. 421, 424 P. 2d 586.)

The defendant claims the trial court erred in refusing to admit evidence of defendant in support of its alternative position that any disability of plaintiff came within the sickness, rather than the accidental injury, provisions of the policy. The matter becomes irrelevant, of course, if the policy is found subject to recision. Nevertheless, under the circumstances present in this costly appeal, we feel obliged to consider the question. The trial rulings in this regard were consistent with the trial court's rulings at pretrial conference when all issues, except disability, were eliminated. We believe the ruling eliminating defendant's alternative position at the pretrial stage was improvidently made.

The sickness-accident issue was fairly within the issues framed by defendant's answer denying disability in the first instance and it was recognized in discovery proceedings.

Here, again, we are handicapped in our review by the absence of a pretrial order reflecting the matters considered and the findings of the trial court. We have only the statement of the trial court, preceding the trial on November 9, 1965:

"The only thing the jury is to determine is whether the man was disabled when the payments were cut off."

We are aware of the disadvantageous position of the trial judge in taking over this complicated litigation in the middle of its lengthy course, a circumstance which undoubtedly contributed as a cause of the confusing entangled record with which we are confronted.

The medical evidence in this record consists of the trial and deposition testimony of some sixteen physicians and surgeons, and many reports and letters concerning examinations and treatment of plaintiff. The evidence is overwhelming that plaintiff was disabled either totally or a high percent partially. There is no question as to the evidence being sufficient to support the jury's findings

of total disability and it appears the preponderance of the medical evidence supports the theory of disability resulting from accident. However, there was some evidence in pretrial depositions that plaintiff's disability resulted entirely, or at least in part, from sickness.

There was general agreement in the medical evidence that plaintiff suffered a "herniated intervertebral disc" while lifting a bag of feed. However, Dr. Bowman, an orthopedic surgeon, testified he had no opinion whether the condition resulted from accident or deterioration.

Defendant claims that under the exception and reduction clause of Part 9 of the policy, reducing "any kind of hernia," whether accidentally caused or otherwise, to a sickness classification, reduces a herniated disc to a sickness rather than an accident disability. Whether the question was ever presented to the trial court is not clear nor is it specifically referred to in defendant's points on appeal. The plaintiff has not briefed the question. Under the circumstances we are not called upon to resolve the matter. Where it does not affirmatively appear that a question raised on appeal was presented to and determined by the trial court it will not be considered by this court on appellate review. (*Norris v. Nitsch,* 183 Kan. 86, 325 P. 2d 326; and *Hoppe v. Hoppe,* 181 Kan. 428, 312 P. 2d 215.)

Pretrial medical depositions disclosed that subsequent to the injury on September 8, 1960, and prior to the trial, plaintiff had ailments diagnosed as cholecystitis with probable stones, obstructional jaundice; questionable calcinosis of the kidneys, in October 1961; kidney stones in November 1961; cirrhosis of the liver in January 1963, and a severe case of jaundice in April 1963.

The plaintiff argues defendant waived its position as to a sickness classification by making disability payments. The payments were discontinued within a 24 months period and under the related provisions of the policy could have been either accident or sickness benefits. The payments were consistent with either theory and therefore cannot be said to amount to a waiver. It must also be noted that assuming total disability commenced with an accident, it would later continue because of sickness. From a review of all the medical evidence we believe a jury question was presented on defendant's alternative position. Defendant may not be able to prove facts sustaining its position but it should have the opportunity.

This court was confronted with a somewhat analogous situation in the recent case of *Williams v. Benefit Trust Life Ins. Co.,*

195 Kan. 579, 408 P. 2d 631, where the action, like here, was to recover benefits under an accident and sickness policy. The question was whether disability resulted from an accidental fall or sickness in the form of osteoarthritis. The trial court, in sustaining a motion for directed verdict, concluded as a matter of law that disability was caused by osteoarthritis and therefore classified as a sickness. This court reversed holding the question as to the underlying cause of disability should have been submitted to the jury.

Defendant further complains the trial court erred in instructing the jury as to total disability in using language other than that used in the policy concerning disability after the expiration of twenty-four months from the date of the accident. The court instructed as follows:

". . . After the expiration of twenty-four months from the date of such accident, it was necessary that you find he was totally disabled, not only from performing the work of his usual occupation, but also the work of such other employment, if any, approximating the same livelihood as the insured might fairly be expected to follow in view of his station, circumstances, and physical and mental capabilities."

The language of the corresponding provision of the policy (Paragraph 2, Part 2) in describing other gainful occupation is "for which he is reasonably qualified by education, training or experience." Defendant claims the jury was misled by the court's failure to use the language of the policy provision and in particular by the use of the term "station." While this contention is not substantial, the instruction should have conformed to the language of the policy clause. Such clauses are generally referred to as "general disability" clauses. They have been deemed clear and unambiguous and the test thereunder is the insured's ability to perform any comparable employment for which he is fitted by education, experience and physical condition. Accordingly, the insurer is entitled to present evidence and if sufficient, appropriate instructions should be submitted. (29A Am. Jur., Insurance § 1516, pp. 620-621; *Fricke v. Mut. Life Ins. Co.,* 152 Kan. 525, 106 P. 2d 677; *Wolf v. Mutual Benefit Health & Accident Association,* 188 Kan. 694, 366 P. 2d 219.)

Complaint is made of other rulings during the trial but as the questions will not necessarily arise on the new trial it is unnecessary to consider them.

Finally, we turn to plaintiff's cross-appeal. Plaintiff's complaints as to the ruling on his motion for summary judgment have been heretofore discussed and disposed of. We believe only one further point raised in the cross-appeal requires our brief discussion. Plaintiff contends the trial court erred in refusing to permit the filing of an amendment to his petition adding another cause of action for damages for "rough shadowing" of plaintiff by a firm of detectives hired by defendant. The trial court gave as its reason that "when a party becomes a litigant to an action he has probably waived his right to claim this as a basis for relief, and that he has probably subjected himself to this type of rough shadowing." Neither party cites authority supporting or contradicting the trial court's reasoning.

Generally a supplemental pleading under K. S. A. 60-215 (*d*) is a mere addition to or continuation of the original pleading and must relate to the same cause and not to matters of a different nature. (Gard, Kansas Code of Civil Procedure Annotated, § 60-215 [*d*], p. 86; *United States v. Russell*, 241 F. 2d 879, [1st Cir.]; *Magee v. McNany*, 10 F. R. D. 5 [Pa. 1950.]) Under the provisions of 60-215 (*d*), *supra*, the matter is generally within the discretion of the trial judge and we find no abuse thereof in denying the amendment under the circumstances here.

Other points raised in the cross-appeal, including plaintiff's motion to dismiss, have been examined and found to be without merit.

In view of our disposition of the case, the points specified by both parties concerning attorney's fees need not be considered at this juncture.

In accordance with what has been said the judgment of the trial court denying plaintiff's amendment to his petition attacked in the cross-appeal is affirmed. In all other respects the judgment is reversed and the cause remanded for a new trial.