ROBERT S. SHAW *vs.* COMMERCIAL INSURANCE COMPANY OF NEWARK, NEW JERSEY.

Suffolk. May 4, 1971. — June 9, 1971.

Present: TAURO, C.J., SPALDING, CUTTER, QUIRICO, & BRAUCHER, JJ.

*Insurance,* Condition, Misrepresentation, Construction of policy, Disability insurance. *Law or Fact.*

Under an occupational disability insurance policy providing that the "policy is issued in consideration of the statements in the application," and that "no misstatements, . . . made by the applicant in the application . . . shall be used to void the policy," the truth of statements made in the application was not a condition precedent to the effectiveness of the contract. [606]

Warranted findings by the trial judge in an action by the insured on an occupational disability insurance policy that shortly before the insured applied for the policy he had "consulted [a medical doctor] for psychotherapy," that the insured "was in fact mentally ill . . . at the time he signed the [insurance] application and had been mentally ill for some time in the past," and that in answering questions in the application the insured "to his own mind answered . . . truthfully [and] never believed . . . that he was or had been mentally ill," would have justified a finding that with respect to a question in the application whether he had "received medical attention or advice" a negative answer by him

was a misrepresentation which "increased the risk of loss" within G. L. c. 175, § 186 [606–607]; an affirmative answer by him to a question in the application whether he was "now in sound condition physically and mentally" could have been found to be an honest expression of opinion and not a misrepresentation "made with actual intent to deceive" or of a matter which "increased the risk of loss" within § 186 [607]; but a lack of clear findings by the judge as to the application of § 186 to such answers and his finding for the insurer required that the insured's exceptions be sustained and that the case be reheard [607].

Under the provisions of an occupational disability insurance policy requiring that to be entitled to weekly indemnity "the Insured be regularly attended by a legally qualified physician . . . other than himself," and with respect to a surgeon claiming disability under such a policy by reason of mental illness, who was mentally ill before, during, and after his voluntary admission to a mental hospital and who was advised by members of the staff of a general hospital and by other doctor friends to seek psychiatric treatment, but who "steadfastly refused" to do so because he "never believed . . . that he was or had been mentally ill," and who never entered into any patient-doctor relationship with other doctors, it was held that in the circumstances the claimant was not excused from being "regularly attended" by a physician, that the claimant had not complied with such requirement except during the period in which he was staying at the mental hospital, and that only for such period was he entitled to weekly indemnity. [608–609]

CONTRACT. Writ in the Superior Court dated January 6, 1966.

The action was heard by *Brogna*, J.

*Robert J. Glass* for the plaintiff.

*Myer Z. Kolodny* for the defendant.

CUTTER, J.    Dr. Shaw in this action of contract seeks to recover on two occupational insurance policies issued by the defendant (the insurer). A Superior Court judge, sitting without a jury, made findings (a) for Dr. Shaw on count 1, with respect to a 1954 policy, for $1,400, with interest, and (b) for the insurer on count 2 with respect to a 1963 policy. Dr. Shaw (by an outline bill of exceptions) presents exceptions to the denial of certain requests for rulings and to the allowance of rulings requested by the insurer.

Dr. Shaw was a vascular surgeon at Massachusetts General Hospital (M.G.H.). He took out an accident, health, and disability policy with the insurer in 1954 (the 1954 policy) and another dated September 3, 1963 (the 1963 policy). In pertinent respects, the two policies appear to

be essentially similar.[1]   The application for the 1963 policy contained questions and answers as follows: Question No. 11.   "Have you been disabled by . . . illness or received medical attention or advice during the past five years?" Answer — "No."   Question No. 12.   "Are you now in sound condition physically and mentally?"   Answer — "Yes."   Part VI, sec. A, of each policy (relating to attendance by a physician) was relied on by the insurer, and that portion of the 1963 policy is quoted in the margin.[2]   The 1963 policy contained a "time limit on certain defenses." [3]

The trial judge made the following voluntary findings, warranted by the evidence, "Dr. Shaw, in the spring of 1963, had consulted for psychotherapy a Dr. Vanderpol with regard to . . . marital difficulties.   On May 3, 1964, Dr. Shaw was voluntarily admitted to the McLean Hospital [McLean]. . . .   The admission diagnosis at . . . McLean . . . was, 'Psychoneurotic depressive reaction, moderately severe, passive aggressive character disorder.'   He was released [by Probate Court order, apparently because he was not so dangerously ill as properly to be held against his will] . . . August 6, 1964, at which time the discharge diagnosis was [in part], 'Schizophrenic reaction, paranoid type, chronic.   Unchanged'. . . .   Dr. Shaw was in fact

---

[1] The insurer's brief refers to no substantial difference between the policies. The 1963 policy states under the heading "Policy Consideration — Policy Period — Renewal Agreement" that the policy "is issued in consideration of the statements in the application for this policy, a copy of which is attached and made a part hereof, subject to the terms and provisions and limitations herein contained and the payment of the initial premium . . . ."

[2] The provision, closely resembling a similar provision in the 1954 policy, appears under the heading, "Part VI.  SICKNESS INDEMNITY FOR TOTAL LOSS OF TIME," and reads: "Sec. A — If such sickness shall wholly and continuously disable and prevent the Insured from performing every duty pertaining to his occupation, *and if the Insured be regularly attended by a legally qualified physician or surgeon, other than himself,* the Company will pay . . . [a specified] weekly indemnity . . ." (emphasis supplied).

[3] This provision appeared under a heading "POLICY PROVISIONS" and reads: "TIME LIMIT ON CERTAIN DEFENSES: (a) After two years from the date of issue of this policy no misstatements, except fraudulent misstatements, made by the applicant in the application for such policy shall be used to void the policy or to deny a claim for loss incurred or disability (as defined in and if covered by this policy) commencing after the expiration of such two-year period."

mentally ill in . . . 1963 at the time he signed the [insurance] application and had been mentally ill for some time in the past, although he had been able to control his mental illness so it did not begin to interfere with his work until sometime in 1964. His mental illness, however, did manifest itself in . . . problems with his wife. . . . [H]is schizophrenia had started long before 1963 but . . . it had been controlled and was not readily apparent. . . . [I]n answering Questions 11 and 12 . . . Dr. Shaw, to his own mind, answered . . . truthfully. He never believed, even after the hospitalization at McLean, that he was or had been mentally ill."

"[U]pon his release . . . [from McLean, Dr. Shaw] was *advised by members of the . . . [M.G.H.] staff and other doctor friends . . . to seek psychiatric treatment.* This he steadfastly refused to do, being of the opinion that the psychiatrists who diagnosed him as mentally ill were in error and that he was in no need of treatment. . . . [H]e was mentally ill [however] during and following his hospitalization . . . and . . . his . . . illness continued at least until July of 1966. . . . [A]fter his release from McLean, he was not allowed to do surgery at . . . [M.G.H.]' and did not perform any of the duties of either a surgeon or a physician. Most of Dr. Shaw's time and efforts in this period were spent *in attempting to get the opinions of the psychiatrists at McLean Hospital overruled . . . by the [M.G.H.] staff.* . . . [F]rom September 23, 1964 to November 1, 1964, Dr. Shaw was employed by the Army Air Force reviewing research studies, for which he received more than nominal compensation. . . . [D]uring this period he was performing duties encompassed in the general field of medicine, but not that of 'surgery' " [4] (emphasis supplied).

---

[4] The findings continued, "He spent a month in the late fall of 1964 in Europe, having been *advised by . . . doctor friends* that a change in environment and the removal of himself from the scene might . . . be helpful . . . . While in Europe, he arranged to go back . . . the following year . . . [as] a doctor and student doing research in problems of human behavior . . . [in which he] had become interested . . . for some time prior to his hos-

Other parts of the trial judge's findings, rulings, and order in large measure deal with requests for rulings.[5] These rulings are discussed below.

1. The judge ruled that two provisions in the 1963 policy, viz. (a) that the "policy is issued in consideration of the statements in the application" (fn. 1, *supra*), and (b) the provision (fn. 3, *supra*) under the heading "Policy Provisions [6] — Time Limit on Certain Defenses," constituted "the equivalent of making the statements in the application conditions precedent to the [effectiveness of the] policy" and "that such statements, being false, although not made fraudulently and with knowledge of their falsity" barred recovery on the 1963 policy. Dr. Shaw saved exceptions to the action of the judge in ruling, as requested by the insurer, in this manner.[7]

Ordinarily, truthful "answers to questions in an original application for insurance are either representations or warranties and not conditions precedent." See *Sullivan* v. *John Hancock Mut. Life Ins. Co.* 342 Mass. 649, 653–654. Interpretation of this written contract is a matter of law for the court. See *Tri-City Concrete Co. Inc.* v. *A. L. A.*

---

pitalization . . . . While in Europe during . . . 1965, he . . . visited hospitals in Iran and in Italy . . . [and] performed a few minor operations. . . . [D]uring this period he was not in fact performing the duties of a physician other than research, and . . . he was disabled by his mental illness.   However, Dr. Shaw *repeatedly refused to accept the advice and recommendations of his fellow physicians that he seek psychiatric care*" (emphasis supplied).   While in Europe, "he was paid out of a charitable trust fund and . . . this pay was minimal."

[5] The judge by his helpful "findings, rulings, and order" has greatly clarified the issues in this unusual situation.

[6] In his decision the trial judge erroneously quoted this general heading as "Policy *Conditions*." The word "Provisions" in fact was used in the 1963 policy.

[7] The judge granted the insurer's requests that he rule (no. 4) that G. L. c. 175, § 186 (incorrectly referred to in the requests as § 196), "does not apply where the application is annexed to the policy"; (no. 5) that "[t]ruthful answers to the questions in the application which is made a part of the policy are conditions precedent before the policy becomes a binding obligation on the insurer"; and (no. 7) "[w]here a policy was issued . . . in consideration of the statements in the application . . . which is made a part of the same . . . the truthfulness of the answers to the questions . . . in the application are conditions rather than representations or warranties and if they were not satisfied, no contractual duty under the policy ever arose."

*Constr. Co.* 343 Mass. 425, 427; *Quintin Vespa Co. Inc.* v. *Construction Serv. Co.* 343 Mass. 547, 551; *Charles L. Hazelton & Son, Inc.* v. *Teel,* 349 Mass. 617, 621. As we read this policy (and we are in as good a position as the trial judge to interpret the contract), truthful statements in the application are not expressly made conditions precedent to the effectiveness of the contract nor is the policy to become void or voidable if the statements are untrue. Cf. *Faris* v. *Travelers Indem. Co.* 278 Mass. 204, 208; *Lopardi* v. *John Hancock Mut. Life Ins. Co.* 289 Mass. 492, 494–497; *Paratore* v. *John Hancock Mut. Life Ins. Co.* 335 Mass. 632, 634–635. The trial judge misinstructed himself in ruling as he did.

2. General Laws c. 175, § 186, reads: "No . . . misrepresentation or warranty made in the negotiation of a policy . . . by the insured . . . shall be deemed material or . . . avoid the policy or prevent its attaching unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter misrepresented or made a warranty increased the risk of loss." This section applies only to representations and warranties and "does not apply to provisions in a policy which . . . are made conditions precedent to the duty of performance on the part of the insurance company." See *Krause* v. *Equitable Life Ins. Co.* 333 Mass. 200, 203–204; *Charles, Henry & Crowley Co. Inc.* v. *Home Ins. Co.* 349 Mass. 723, 725–726. We thus must consider whether the statements in the application for the 1963 policy could have been found to pass the dual test of § 186.

Dr. Shaw's negative answer to the question whether he had "received medical attention or advice during the past five years" could be found not to have been true. He, as the judge found, "in the spring of 1963 . . . consulted for psychotherapy a Dr. Vanderpol with regard to . . . marital difficulties." Despite the judge's finding that "Dr. Shaw, to his own mind, answered these questions truthfully" because he "never believed . . . he was . . . mentally ill," he had received this psychotherapy from a medical doctor.

We need not decide whether under § 186, because of Dr. Shaw's subjective belief in the truthfulness of his answer, there was no "actual intent to deceive." The negative answer could be found to have been a misrepresentation which "increased the risk of loss" within § 186. See *Pahigian* v. *Manufacturers' Life Ins. Co.* 349 Mass. 78, 86–87. If the consultations with Dr. Vanderpol had been disclosed, inquiry by the insurer might have revealed Dr. Shaw's mental condition.

Whether the risk of loss indeed is increased "is commonly a question of fact." See *Davidson* v. *Massachusetts Cas. Ins. Co.* 325 Mass. 115, 119. Psychotherapy at the hands of a medical doctor could be found to constitute medical attention,[8] although perhaps even a doctor might regard the term "medical attention or advice" as encompassing only physical ailments and as not extending to psychotherapy. Any ambiguity in the question, as applied to particular facts, is to be construed (as in the case of a policy provision) against the insurer. See *Palmer* v. *Pawtucket Mut. Ins. Co.* 352 Mass. 304, 306.

The judge's finding, that Dr. Shaw "never believed . . . that he was or had been mentally ill," leads us to conclude (as apparently the judge did) that his answer to question 12 might be found to be an honest expression of opinion which would pass the tests of § 186. See *Davidson* v. *Massachusetts Cas. Ins. Co.* 325 Mass. 115, 119–120; annotations, 26 A. L. R. 3d 1061, 30 A. L. R. 3d 389.

We think that the trial judge has not passed clearly upon the issues of fact concerning whether the answers to questions 11 and 12 were misrepresenta(tions which increased the risk of loss within the dual test of § 186. These issues arising under count 2 must be dealt with by the trier of the facts when the case is reheard.

---

[8] Cases cited by Dr. Shaw concerning treatment (held not to constitute medical attention) by a radiologist's assistant, osteopaths, chiropractors, and magnetic healers, are distinguishable. See *Pacific Mut. Life Ins. Co.* v. *Cunningham,* 54 F. 2d 927, 932–933 (S.D. Fla.); *Galloway* v. *Prudential Ins. Co.* 112 Kans. 720, 724; *New York Life Ins. Co.* v. *Modzelewski,* 267 Mich. 293, 296–297; *LeGrand* v. *Security Benefit Assn.* 210 Mo. App. 700, 705–707. See also *Western & So. Life Ins. Co.* v. *Angel,* 77 Ind. App. 665, 668.

3. Applicable to both the 1954 and the 1963 policies are issues with respect to Part VI, Sec. A, of each policy (see fn. 2, *supra*). That provision requires that "the Insured be regularly attended by a legally qualified physician . . . other than himself." The judge's findings and the evidence suggest that Dr. Shaw, even though he did not think that he needed treatment or that he was mentally ill, was getting all the medical treatment to which his numerous medical colleagues and friends could persuade him to submit. A major symptom of his illness was his inability to recognize that he was ill. The questions thus arise (a) whether, in the circumstances, he could be regarded as excused from being "regularly attended" by a physician (as Dr. Shaw requested the judge to rule), and (b) whether the essentially undisputed facts, concerning the medical attention given to him, may be viewed as compliance with the provision.

It is argued in effect that the provision for attendance by a physician is ambiguous, that it should not be regarded as a condition of the policy, and that it should be construed against the insurer. The insurer relies upon the somewhat harsh construction of a similar policy provision in *Lustenberger* v. *Boston Cas. Co.* 300 Mass. 130. We are not disposed to extend that decision in any degree and recognize that it runs counter to persuasive authority elsewhere. Cf. *Dixon* v. *Pacific Mut. Life Ins. Co.* 268 F. 2d 812, 816 (2d Cir.), cert. den. 361 U. S. 948.[9] Nevertheless, we think this provision of the policies sufficiently clearly requires an insured like Dr. Shaw, who claims to be disabled by mental illness, to consult and to be attended by a doctor, even in these circumstances. He is not shown to have been incapable of understanding the policy provision. He knew that others thought him ill. If he wished to collect pay-

---

[9] Other cases taking a less rigid view of the provision for regular attendance by a physician are collected in an annotation, 84 A. L. R. 2d 375. See *Commercial Cas. Ins. Co.* v. *Campfield,* 243 Ill. App. 453, 456; *Moore* v. *Standard Acc. Ins. Co.* 245 Ill. App. 300, 303; *Hodgson* v. *Mutual Benefit Health & Acc. Assn.* 153 Kans. 511, 517–519; *Hunter* v. *Federal Cas. Co.* 199 App. Div. (N. Y.) 223, 226–227; *Massachusetts Bonding & Ins. Co.* v. *Springston,* 283 Pac. 2d 819, 822–823 (Okla.); *Music* v. *United Ins. Co.* 59 Wash. 2d 765, 768–769.

ments under the policies, he should have submitted to medical attendance even if he thought it unnecessary.

To be sure, Dr. Shaw did talk with doctors, but he could be found not to have entered into any patient-doctor relationship with any of them. They tried to help him but he would not permit them to do so. Even though his belief that he was not ill may have been a manifestation of the illness causing his disability, we see no basis for concluding that compliance with the provision was excused, at least while possibility existed that medical attendance might be beneficial. The judge did not err in refusing to rule that the evidence permitted a finding that compliance with the provision for "regular attendance by a physician was excused," or in finding on the evidence that there was no such compliance except during the period of Dr. Shaw's stay at McLean. Under both the 1954 and the 1963 policies, the provision for medical attendance, by itself, does not preclude recovery by Dr. Shaw for the period during which he was at McLean.

4. The exceptions with respect to count 1 are overruled and judgment is to enter for Dr. Shaw according to the trial judge's finding on that count. The exceptions dealt with in parts 1 and 2 of this opinion as to count 2 are sustained.

*So ordered.*