**HENNES ERECTING COMPANY, Plaintiff-Appellant/Cross-Appellee,**

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, Defendant-Appellee/Cross-Appellant.**

Nos. 85–1095, 85–1115.

United States Court of Appeals, Tenth Circuit.

March 23, 1987.

Paul H. Niewald, Niewald, Waldeck, Norris & Brown, Overland Park, Kan. (Michael G. Norris and June Clark of the same firm with him on the brief), for plaintiff-appellant/cross-appellee.

Charles R. Tuffley, Denenberg, Tuffley & Bocan, Southfield, Mich. (Susan Tukel of the same firm and Jerome F. Bales, Wallace, Saunders, Austin, Brown & Enoch, Chartered, Overland Park, Kan., with him on the brief), for defendant-appellee/cross-appellant.

Before McKAY, McWILLIAMS and BALDOCK, Circuit Judges.

BALDOCK, Circuit Judge.

In 1980, the Board of Public Utilities of Kansas City, Kansas was building a power plant known as the Nearman Creek Power Station. Appellant contracted to install a Westinghouse 235,000 kw turbine generator in the project. On December 30, 1980, the turbine shaft of the generator was damaged severely during performance testing due to the failure of the number 1 main bearing. The failure was caused by the disconnection of an oil lubricating line servicing that bearing. The total amount of the loss was $373,646.52 with plaintiff-appellant (Hennes) sustaining a direct loss of $221,075.24.

Hennes was insured under an installation floater policy[1] issued by St. Paul Fire &

---

1. In a Certificate of Insurance supplied by Hennes to BPU, the property insured under the St. Paul policy is described as follows: "Erection of one 235,000 kw turbine-generator-Nearman Station contract 87B." The St. Paul policy provided coverage on:

Marine Insurance Co. (St. Paul) with a policy limit of $1 million subject to a $1,000 deductible. Defendant-appellee (National Union) had issued a builder's risk policy [2] to the Board of Public Utilities with a policy limit of $50 million subject to a $100,000 deductible during performance testing. By endorsement, contractors and subcontractors (including Hennes) were named as additional insureds on the builder's risk policy issued by National Union.

In January 1981 both St. Paul and National Union were notified of the loss. The loss was investigated and both firms appointed adjusting firms. During this time, representatives of St. Paul and National Union discussed potential liability for the loss. St. Paul issued a loan receipt to its insured for $220,075 and commenced this action against National Union in the name of the insured. After a jury trial, the district court entered judgment in the amount of $101,370.67 against National Union. Both parties appealed.

In this diversity case, we apply the substantive law of Kansas. 28 U.S.C. § 1332; *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The questions which we consider relate to the district court's interpretation and application of state law.

### I.

St. Paul contended that National Union was liable for the entire amount of the direct loss sustained by Hennes less the $1,000 deductible. Before trial, the district court granted partial summary judgment in favor of National Union determining that

National Union's maximum amount of liability would be $60,537.62 (later changed to $101,370.67) under its policy. The district court determined that under Kansas law both policies provided primary coverage for the loss and the conflicting "other insurance" clauses in each policy were to be disregarded with the loss prorated equally up to the limits of the lower policy.

As noted, two types of insurance policies are involved: an installation floater policy and a builder's risk policy. The distinction between the two has been summarized as follows:

A blanket, compound, or floater policy is written upon a risk as a whole, embracing whatever articles or items are included therein, often changing in its nature, in contravention thereto, a specific policy is one which allocates the amount of the risk in stated values upon the several items embraced in the coverage, or covers property at a designated location for a stated amount or insures against a specific peril.

6 Appleman, Insurance Law and Practice § 3912 (1972) (footnotes omitted). St. Paul suggests that the builder's risk policy issued by National Union provides coverage for risks in connection with the specific construction project for which it was issued, while the installation floater policy issued by St. Paul provides general coverage for risks associated with the installation of turbine generator without regard to location. Under this theory, National Union's policy provides specific coverage while St. Paul's policy provides blanket coverage.

---

A. Shipments of machinery, contractors and builders' equipment and supplies and/or such commodities which because of shape, size, form or weight requires use of special equipment or special handling, the property of others, accepted by the Insured for moving, rigging erecting, hoisting and lowering, assembling and disassembling, loading or unloading or installation operations known as heavy hauling even though no trucks or trailers are used or required in the operation and continuing until installation, if any, is completed and while said property is temporarily located in depots, warehouses or loading docks and/or platforms whether in premises of others, for a period of time ..., but only while in

custody of the Insured all within the limits of the United States or Canada. (emphasis ours).

2. The National Union builder's risk policy provided:

8. **PROPERTY COVERED:** This policy insures any and all materials, equipment, machinery and supplies of any nature whatsoever, to be used in or incidental to the fabrication, erection and completion of the project as stated in Item F of Declarations including while in transit ... to the erection site and while there until the completion of the project as stated in Item C of Declarations.

Traditionally, a blanket policy provides excess coverage over and above specific insurance and is not effective until the specific insurance is exhausted. *Jorski Mill & Elevator Co. v. Farmers Elevator Mutual Insurance Co.*, 404 F.2d 143, 146 (10th Cir.1968). Based on this distinction, St. Paul contends that it is not liable for the loss in question; rather National Union is and in full. In this case, however, each insurer's liability is not determined with reference to the traditional rule because of conflicting "other insurance" clauses in each policy.[3] An "other insurance" clause is designed "to limit, reduce or avoid an insurer's loss in those cases where there is multiple coverage." *Carriers Insurance Co. v. American Policyholders' Insurance Co.*, 404 A.2d 216, 218 (Me.1979). Here each policy insures against property damage and contains an "other insurance" clause of the excess variety. An excess "other insurance" clause provides that the insurer's liability will only be in excess of amounts due under other policies. There is not a problem so long as only one policy contains an excess "other insurance" clause. When more than one policy contains the clause, a court must construe such provisions to allocate liability.

Kansas has followed the majority rule and determined that conflicting "other insurance" excess coverage provisions are mutually repugnant and are to be disregarded. *Western Casualty & Surety Co. v. Universal Underwriters Co.*, 232 Kan. 606, 657 P.2d 576, 580 (1983); *see also* Note, Insurance: Apportionment of Loss Between Conflicting Excess "Other Insurance" Clauses in Automobile Liability Cases, 23 Washburn L.J. 195 (1983). In such circumstances, liability is to be prorated equally between the two policies up to the limit of the lower policy; thereafter, the higher policy is available. *Western Casualty*, 657 P.2d at 582.

St. Paul suggests that the "other insurance" clause in National Union's policy is of no effect because the two policies are not concurrent, have no identity of interest in the same property, the same risk, or in the name of or for the benefit of the same insured. We must disagree with this characterization of the policies. The record reveals that both policies were in effect at the date of the loss and provided coverage for property damage to the turbine generator. Hennes was a named insured on both policies. The two policies need not be identical for the excess "other insurance" clauses to apply.

The district court was correct in its decision to disregard the conflicting "other insurance" clauses. This meant that each policy was then "considered as affording dual primary coverage" with the amount of any loss covered by both policies to be prorated between the two insurers. *Western Casualty*, 657 P.2d at 580.

## II.

National Union denied the claim of Hennes in writing on April 30, 1981, based on the "other insurance" clause in the National Union policy. At trial, National Union relied on the following exclusion:

**11. PERILS EXCLUDED:** This insurance does not insure

.    .    .    .    .

**3.** The St. Paul policy provides:
Other insurance permitted without notice until required; and it is hereby declared and agreed that whenever any of the foregoing described property at the time of any loss is covered by other insurance in this or any other Company, prior or subsequent in date to this Policy, whether such insurance is fire, marine, inland, floating, specific or insured Bill of Lading, this Policy shall not extend to cover same, excepting only as far as relates to any excess of value beyond the amount of such other insurance, and shall not be liable for any loss, unless the amount of such loss shall exceed the amount of such other insurance, which said excess only is declared to be under the protection of this Policy.
The National Union policy provides:
**18. OTHER INSURANCE:** This policy shall not cover to the extent of any other insurance whether prior or subsequent hereto in date, and by whomsoever effected, directly or indirectly covering the same property against the same perils; and this Company shall be liable for loss or damage only for the excess value beyond the amount due from such other insurance.

(j) Loss or damage covered under any guarantee or warranty (expressed or implied) by any contractor, manufacturer or supplier whether or not such contractor, manufacturer or supplier is an insured under this policy.

National Union's theory was that the loss was covered by express warranties in the contract between Hennes and the Board of Public Utilities which provided:

MATERIALS AND WORKMANSHIP: ... All materials and workmanship shall be first-class in every respect. All labor shall be performed by skilled workmen, duly qualified to do their respective jobs to the satisfaction of the Owner and the Engineer.

REPAIR AND/OR REPLACEMENT OF DEFECTIVE PORTIONS:

.   .   .   .   .

The Contractor warrants to the Purchaser that the work of this Contract will be free from defects in material, workmanship and title and will meet the specifications contained in the Contract of Sale.

CORRESPONDENCE:

.   .   .   .   .

The Contractor warrants to the Purchaser that the work of this Contract will be free from defects in material, workmanship and title and will meet the specifications contained in the Contract of Sale.

Contract at D–15 and E–8; *see also* Contract at G–1 & G–2 (Purchaser and Contractor agree that the Contractor shall, "in good substantial and workmanlike manner and in accordance with the provisions of this Contract Document, execute and complete all work included in and covered by the Purchaser's official award of this Contract to the said Contractor."); Contract at F–3 (Purchaser may withhold payments due to the Contractor for "[w]ork that is defective or guarantees that have not been met and that remain uncorrected.") National Union also maintained that the loss was covered under the implied warranty to do a workmanlike job and use appropriate and reasonable care and skill. *Crabb v. Swindler*, 184 Kan. 501, 337 P.2d 986, 989 (1959). The warranty to perform in a workmanlike and reasonable manner is

specified in the contract. Moreover, an implied warranty exists in the absence of an express provision concerning workmanship. *Belger Cartage Service Inc. v. Holland Construction Co.*, 224 Kan. 320, 582 P.2d 1111, 1122 (1978); *Gilley v. Farmer*, 207 Kan. 536, 485 P.2d 1284, 1289 (1971).

Hennes contended that National Union had waived its right to rely upon any exclusion in the policy because such an exclusion was not mentioned when National Union rejected Hennes' claim in April 1981. On appeal, National Union contends that the trial court should not have allowed the jury to consider the waiver issue and should have granted judgment n.o.v. because all trial evidence establishes that the loss was due to an insufficiently tightened fitting which would be covered under Hennes' warranty to the Board of Public Utilities. We agree.

■ Under Kansas law, waiver is an intentional and voluntary relinquishment of a known right when a party is in full possession of the facts. *State Farm Mutual Auto Ins. Co. v. Bockhorst*, 453 F.2d 533, 536 (10th Cir.1972); *Schneider v. Washington Ins. Co.*, 200 Kan. 380, 437 P.2d 798, 813 (1968); *Marett v. World Fire & Marine Ins. Co.*, 160 Kan. 125, 160 P.2d 664, 672 (1945). The trial court's Instruction Number 13 correctly sets out the elements of waiver. The difficulty is that waiver cannot be used to expand the coverage of an insurance contract; it applies only to forestall the forfeiture of a contract. *Prime Drilling Co. v. Standard Accident Ins. Co.*, 304 F.2d 221 (10th Cir. 1962); *Western Food Products Co. v. United States Fire Ins. Co.*, 10 Kan. App.2d 375, 699 P.2d 579 (1985); *Ron Henry Ford, Lincoln, Mercury Inc. v. National Union Fire Ins. Co.*, 8 Kan.App.2d 766, 667 P.2d 907 (1983); *Swanston v. Cuna Mutual Ins. Co.*, 7 Kan.App.2d 28, 636 P.2d 1368 (1981).

■ In *Swanston v. Cuna Mutual Ins. Co.*, the court considered the effect of a provision in a group credit life policy which required that the insured be "physically able to perform, or within a reasonable

time to resume, the usual duties of his livelihood." The parties stipulated that the insured was physically unable to perform the duties of any occupation in which he had engaged. The policy allowed the insuror to require proof of insurability, however, the insurer did not. The failure of the insurer to avail itself of this provision did not serve to expand coverage.

Finally, plaintiff now argues that defendant had a right to require proof of Swanston's insurability and, having never exercised that right, waived any question of coverage. ... [I]t is the well settled general rule waiver and estoppel cannot be used to expand the *coverage* of an insurance contract. See 43 Am. Jur.2d, Insurance § 1058, p. 983 (1969); 45 C.J.S. Insurance § 674, p. 616 (1946). Defendant's failure to require proof of insurability did not serve to meet the explicit condition of coverage.

*Swanston,* 636 P.2d at 1370–71. Likewise, National Union's failure to list exclusion 11(j) when it rejected Hennes' claim does not operate to eliminate the exclusion from the policy.

In *Western Food Products Co. v. United States Fire Insurance Co.,* 10 Kan.App.2d 375, 699 P.2d 579 (1985), the court considered a provision in an airplane insurance contract which required the pilot to have a valid medical certificate. The insured admitted that the pilot did not have a current medical certificate, but argued that the insurer was estopped from denying coverage on this basis because of implied knowledge. After repeating the general rule that waiver and estoppel cannot be used to expand

the scope of an insurance contract, the court stated:

> We have concluded that defendant's policy unambiguously excludes coverage of the factual situation in this case. There is no forfeiture of coverage being effected; the insured was never protected for the circumstances which took place. Therefore, the equitable relief of estoppel claimed by plaintiff is inappropriate because it would operate to expand the plain scope of the insurance policy.

*Western Food Products,* 699 P.2d at 584. To the extent that the loss was covered by Hennes' warranty to the Board of Public Utilities, the National Union policy did not provide coverage for the loss.

Allowing the jury to consider whether National Union waived exclusion 11(j) carries with it the potential that the jury's verdict will operate to expand coverage beyond the terms of the policy. At most, the jury could consider only whether the loss was covered by an express or implied warranty made by Hennes. If the loss was covered by such a warranty, the loss was not covered under the National Union policy because of exclusion 11(j). If the loss was not covered by such a warranty, then exclusion 11(j) would not operate and National Union could not avoid liability based on the exclusion. The language of exclusion 11(j) is plain and unambiguous under these circumstances.[4]

The cases relied upon by St. Paul are not to the contrary. These cases establish that an insurer, basing a refusal to pay a loss

---

4. The trial court determined that some or all of the provisions in the National Union policy were ambiguous and gave the following instruction *sua sponte:*

> The terms of the insurance policy, including any endorsements attached thereto, are susceptible of more than one meaning. Therefore, you must give the policy provisions that meaning which is most favorable to the policyholder.

Instruction Number 11(A). The jury was instructed only concerning exclusion 11(j). This instruction is improper for several reasons. First, the instruction is not specific; it could encompass the entire insurance policy. Second, the parties had not claimed that exclusion 11(j) was ambiguous. As can be inferred from our

previous discussion, we do not find exclusion 11(j) to be ambiguous. The National Union policy excludes loss or damage which is covered by any guarantee or express or implied warranty made by any contractor or manufacturer or supplier, regardless of whether the same is insured under the National Union policy. Stated another way, there is no policy coverage if the loss or damage is otherwise covered by warranty. And third, in the absence of every policy provision being flawed by ambiguity, an insured is not entitled to an instruction that all policy provisions should be construed in his favor. *Western Food Products Co. v. United States Fire Ins. Co.,* 10 Kan.App.2d 375, 699 P.2d 579, 581 (1985).

entirely on one ground of forfeiture, could not then maintain a defense of forfeiture based the violation of another policy provision. *See e.g. Pacific Indemnity Co. v. Berge*, 205 Kan. 755, 473 P.2d 48 (1970); *Svetlicic v. Farmers' Alliance Ins. Co.*, 136 Kan. 551, 16 P.2d 956 (1932); *Kimmi v. Brown County Farmers' Mut. Fire Ins. Co.*, 135 Kan. 555, 11 P.2d 706 (1932); *Docking v. National Surety Co.*, 122 Kan. 235, 252 P. 201 (1927); *Farmers' Alliance Insurance Co. v. Ferguson*, 78 Kan. 791, 98 P. 231 (1908). For example, in *Svetlicic v. Farmers' Alliance Ins. Co.*, 136 Kan. 551, 16 P.2d 956 (1932), the insurer initially claimed a forfeiture of coverage because of a prohibition against additional insurance on the same property without its consent. Thereafter, the insurer claimed a forfeiture because two mortgages covered the property and only one was noted on the application for insurance. The court said:

> "Where an insurer bases its refusal to pay a loss entirely on a forfeiture, caused by the failure of the insured to comply with a particular condition of the policy, it cannot, when sued for the loss, maintain a defense founded upon another alleged forfeiture, for violation of other conditions, not referred to in such refusal, and of which it had knowledge when the refusal was made." *Farmers' Alliance Insurance Co. v. Ferguson*, 78 Kan. 791, syl. par. 1, 98 P. 231.

*Svetlicic*, 16 P.2d at 958. National Union has not claimed a forfeiture of the policy by Hennes. Rather, National Union contended that, although the policy was not void, the loss was beyond the coverage of the policy, initially because of the "other insurance" clause and later because of exclusion 11(j). While timely and complete disclosure of the reasons for denying a claim would certainly have been preferable, waiver and estoppel cannot be used in these circumstances to increase the insurer's risk beyond the terms of the policy.

By special verdict form, the jury decided that Hennes was entitled to recover from National Union for the loss. We do not know whether the jury's verdict was based on a determination that National Union waived exclusion 11(j) or whether the decision was based on a determination that the loss was not covered by a warranty within the meaning of exclusion 11(j). At the close of all the evidence, National Union renewed its motion for a directed verdict. One of the grounds asserted was that the evidence, without exception, established that the loss in question was caused by defective workmanship and the contract between Hennes and the Board of Public Utilities contained an express warranty concerning workmanship. We now consider the trial court's denial of National Union's motion for judgment n.o.v. under the standards of Fed.R.Civ.P. 50(b).

In reviewing a district court decision on a motion for judgment n.o.v., we are obligated to view the evidence and the inferences therefrom in the light most favorable to the prevailing party. *Fox Motors, Inc. v. Mazda Distributors (Gulf), Inc.*, 806 F.2d 953, 955 (10th Cir.1986). At the same time, speculation and conjecture will not suffice for reasonable inferences based on the evidence. *Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511, 520–21 (10th Cir.1987). The evidence in this case concerning the cause of the loss is uncontroverted. Mr. Robert R. Bayles, plaintiff's witness and a professional consulting engineer testified that the damage which occurred in the bearing support of the turbine assembly was the result of high temperatures due to a lack of lubrication of one segment of the bearings. One of the four lubricating lines servicing a bearing had become disconnected. Mr. Bayles examined the oil lubricating line and its fitting. He found no evidence that the oil lubricating line had failed; rather the fitting had become disconnected because it had not been tightened properly.[5] Mr.

---

5. On cross examination, Mr. Bayles testified that there was no evidence of fractures, breaks or metal distress on the line, nor was there any evidence of failure of the fitting. Record vol. VII at 96. Likewise, there was no evidence that

the threads had been manufactured improperly or that the fitting had been cut off. *Id.* at 97. He further testified:

> Q. Based upon your background and experience, can you tell the Court and jury what

Dennis J. Feurer, the startup engineer of the project testified that the failure was caused by the line not being tightened adequately. Record vol. VII at 117. There has never been any dispute that Hennes was responsible for tightening the fitting on the oil supply line. Mr. Larry Lee Aldridge, defendant's witness and the piping superintendent for Hennes, testified about the difficulty in tightening the connection because of its location. Although he indicated that the fitting was tightened as securely as it could be under the circumstances, he expressed no opinion on whether the line disconnected due to a failure to tighten the connection. Record vol. VII at 157. After the loss, the fitting was tightened using a wrench modified to obtain greater leverage. The evidence is uncontroverted that the cause of the loss was a failure by Hennes personnel to tighten the connection properly. Any other conclusion as to the cause of the loss on this record would be speculation and conjecture without a basis in the evidence presented to the jury. *See Sunward Corp. v. Dunn & Bradstreet,* 811 F.2d at 520, citing *Daniels v. Twin Oaks Nursing Home,* 692 F.2d 1321, 1326 (11th Cir.1982).

█ The failure to tighten the connection properly is a breach of the express warranty to perform in a workmanlike and reasonable manner. Thus, the loss is beyond the risks covered in the National Union policy due to exclusion 11(j). St. Paul contended during trial that the warranty applied only after the project had been finally accepted based on the following provision:

> REPAIR AND/OR REPLACEMENT OF DEFECTIVE PORTIONS: The Contractor shall be responsible for a period of one year from and after the date of acceptance by the Purchaser of the work covered by this Contract, for any repairs or replacements caused by defective materials, workmanship or equipment which in the judgment of the Engineer shall become necessary during such period.

.   .   .   .   .

Contract at E–7. This argument can be rejected as a matter of law. Merely because the warranty period extends beyond acceptance for one year does not mean that the warranty to perform in a workmanlike manner has been disclaimed so as not to operate during construction and performance testing. We agree with the court in *Bridges v. Ferrell,* 685 P.2d 409, 411 (Okla. Ct.App.1984) that the overwhelming weight of authority is "that an express warranty against defects for a limited period of time should not be interpreted as a limitation upon a builder vendor's liability for defective work, and in no way impairs its general obligation to perform the contract in a proper, workmanlike manner." Moreover, the law would imply a warranty to perform in a workmanlike manner during construction and performance testing even if St. Paul was correct in its theory that the contract did not provide such an express warranty. *Tamarac Development Co. v. Delamater, Freund & Associates,* 234 Kan. 618, 675 P.2d 361, 365 (Kan.1984).

In view of our decision, it is unnecessary to consider the balance of arguments raised on appeal. The case is remanded to the district court with instructions to vacate the judgment against National Union.

REVERSED.

---

your opinion is as to how the oil line became disconnected?

A. It is my understanding from records at the Nearman Creek Station that this machine was nearing completion and nearing a state where it could be put into beneficial use, and that in the process of completing the installation there had been, it was my understanding, three runs of the machine at reduced speeds. The machine had been run three times in preparation for final testing. And this indicates to me, this leads me to the opinion that there was some lubrication in the bearing or the three initial runs couldn't have been made. That is my opinion. Based on that, I feel that the lubricating fittings had all been attached to some degree but that the fitting was found to be disconnected after the loss had not been sufficiently tightened to make it secure and that it backed off or became detached as the machine test proceeded.

Q. So the fitting had not been tightened properly?

A. That is my opinion, yes, sir.

*Id.* at 97–98.